WILLIAM McCARTY, Plaintiff, *v.* VERSON ALLSTEEL PRESS CO., Defendant and Third-Party Plaintiff-Appellee.—(NASH BROS. CO., Third-Party Defendant-Appellant.)

First District (4th Division)    No. 79-681

Opinion filed September 25, 1980.—Rehearing denied November 6, 1980.

Ruff & Grotefeld, Ltd., of Chicago (John J. Reidy and Philip L. Noteboom, of counsel), for appellant.

Lord, Bissell & Brook, of Chicago (C. Roy Peterson, Richard E. Mueller, and Hugh C. Griffin, of counsel), for appellee.

Mr. JUSTICE ROMITI delivered the opinion of the court:

The third-party plaintiff was sued by an employee of the third-party defendant who was injured while using a machine manufactured by the third-party plaintiff. The third-party plaintiff settled and sued the third-party defendant, claiming it was entitled to idemnification under a clause contained in its form sent along with its price quotation. The trial court, after a bench trial, found that the clause was part of the contract and entered judgment for third-party plaintiff in the amount of $322,745.44. We disagree and reverse.

In early 1971, Nash Bros. Co. (hereinafter called buyer), and Verson Allsteel Press Company (hereinafter called seller), entered into oral negotiations regarding the sale of a punch press from the seller, Verson, as a manufacturer, to Nash, the buyer. These negotiations centered almost completely around the technical specifications of the subject punch press. At no time during this period of oral negotiation were any discussions had regarding the indemnification of seller by buyer for injuries caused by defects in seller's presses.

On May 19, 1971, seller sent buyer a document entitled Proposal No. 5575-1-RB. It stated: "In accordance with your request, we are pleased to offer the following press brake equipment for your consideration * * *." A detailed list of "General Specifications" and "Items Included" followed. The proposal concluded:

> "Point of operation guards are not included with this equipment. It is the employer's responsibility to provide guards, devices, tools, or other means to effectively protect all personnel from serious injury which may otherwise occur as a result of any particular machine use or activity.
>
> Thank you for this opportunity to offer our equipment. Should you require any additional information, please let us know."

This offer was subject to 30 days' acceptance.

At the foot of the first page of the proposal was the legend: "All quotations, orders and contracts are subject to acceptance of home office."

Enclosed with the May 19th proposal was a copy of seller's form "Conditions of Sale-Machinery." In pertinent part, these provided:

"VERSON ALLSTEEL PRESS COMPANY
Chicago, Illinois
CONDITIONS OF SALE-MACHINERY

## 7. WARRANTY—WARRANTY LIMITATIONS—INDEMNITY,

(a) Subject to the other provisions of Verson's proposal and these conditions, Verson warrants all goods manufactured by Verson to be free from defects in material and workmanship for a period of one (1) year from the date of shipment. All goods sold hereunder not manufactured by Verson are warranted by Verson only to the extent provided by and enforceable against the manufacturer of such goods. Unless otherwise specified, wiring will conform to Verson's interpretation of the National Electrical Code. VERSON MAKES NO WARRANTY OF ANY KIND WITH RESPECT TO RUBBER GOODS OR FIXTURES.

(b) Verson's obligation hereunder shall be limited to the replacement of such parts which examination shall disclose to the satisfaction of Verson to have been defective under ordinary and normal use, provided written notice of such defects shall be given by customer within thirty (30) days after they first appear. In no event shall Verson have any liability whatsoever for payment of any consequential, incidental, indirect or special damages of any kind, including, but not limited to, any loss from profits. No allowance will be made for any expenses incurred by customer in repairing defective parts or supplying any missing parts, except on the written consent of Verson. In any case where Verson is effecting the replacement or repair of any defective parts, customer shall have the responsibility and bear all the costs of procuring and providing all necessary dismantling, reassembling and handling facilities in connection therewith.

(c) Customer assumes and shall bear all responsibility for providing adequate and sufficient safeguards, work handling tools and safety devices to protect fully the operator and any other users of the goods at all times, in accordance with the prevailing federal, state, and local codes and industry-accepted standards. Verson shall bear no liability whatsoever for the failure of customer to order, install, or use such safeguards, work handling tools or safety devices. Customer shall establish and use, and require all persons operating the equipment to use, all proper and safe operating procedures, including but not limited to procedures set forth in any manuals or instruction sheets relating to the equipment. Customer shall not remove or modify any devices, warning sign, or manual furnished with, or installed upon or attached to the goods. NOTWITHSTANDING ANY PROVISION OF THESE TERMS AND CONDITIONS, THE WARRANTY CONTAINED IN THIS PARAGRAPH, AS LIMITED HEREIN, IS THE ONLY WARRANTY EXTENDED BY VERSON IN CONNECTION

WITH ANY SALE BY IT AND IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR PURPOSE.

8. INDEMNITY,

Customer hereby (1) waives, releases and discharges any and all claims of any and every kind (including but not limited to injury to or death of any person or damage to property), which it may have at any time against Verson, its agents or employees, by reason of or arising out of any claimed improper design, specifications or manufacture of the goods sold hereunder, or of devices; and (2) covenants to indemnify and hold-harmless Verson, its agents and employees of, from and against any and all loss, damage, expense, claims, suits or liability which Verson or any of its employees may sustain or incur at any time for or by reason of any injury to or death of any person or persons or damage to any property, arising out of any claimed improper design or manufacture of the goods sold hereunder, or of any claimed inadequate or insufficient safeguards or safety devices.

* * *

14. ACCEPTANCE—WHOLE AGREEMENT,

ALL ORDERS ARE VALID AND BINDING UPON VERSON ONLY UPON ACKNOWLEDGMENT BY A DULY AUTHORIZED OFFICER OR DEPARTMENT MANAGER OF VERSON, BY ANY ACKNOWLEDGMENT OR ACCEPTANCE BY CUSTOMER IN ANY MANNER OF VERSON'S PROPOSAL, OR BY THE SUBMISSION OR ISSUANCE OF CUSTOMER'S OWN PURCHASE ORDER BASED ON SUCH PROPOSAL, CUSTOMER UNCONDITIONALLY ACCEPTS AND AGREES TO BE BOUND BY THE TERMS AND CONDITIONS HEREIN, SUCH TERMS AND CONDITIONS SHALL CONSTITUTE THE COMPLETE AGREEMENT BETWEEN CUSTOMER AND VERSON AND SHALL NOT BE SUPERSEDED BY ANY CONDITIONS OR PROVISIONS IN CUSTOMER'S ORDER WHICH MAY CONFLICT WITH, BE CONTRARY TO OR OTHERWISE VARY FROM THOSE HEREIN CONTAINED. ALL PREVIOUS COMMUNICATION BETWEEN THE PARTIES HERETO, WHETHER VERBAL OR WRITTEN, WITH REFERENCE TO THE SUBJECT MATTER HEREOF, IS HEREBY ABROGATED, IT BEING UNDERSTOOD THAT THERE ARE NO OTHER AGREEMENTS, UNDERSTANDINGS,

GUARANTEES OR WARRANTIES ·WHATEVER, EXPRESS OR IMPLIED, EXCEPT AS CONTAINED IN VERSON'S PROPOSAL, AND THESE CONDITIONS.

> Verson Allsteel Press Co."

On or about May 28, 1971, seller sent buyer its Proposal No. 5575-1-RB Revised. This document contained language almost identical to the May 19, 1971, proposal in its opening and conclusion. It also provided that the prices were subject to 30 days' acceptance and that all quotations, orders and contracts were subject to the acceptance of the home office. The enclosures included another copy of seller's "Conditions of Sale-Machinery." Various changes were made, however, in the "General Specifications" and "Included Items."

On June 8, 1971, seller sent buyer a letter, on its own stationery, reducing the price of the press which was the subject of its proposals. On the face of this letter was printed:

> "All quotations, orders and contracts are subject to acceptance of home office and are contingent upon strikes, fires or other causes beyond our control."

Seller's "Conditions of Sale" were not included with this document and did not appear therein.

On June 16, 1971, buyer sent seller its form "PURCHASE ORDER." On its face was typed:

> "IN ACCORDANCE WITH YOUR QUOTATION PROPOSAL NO. 5575-1-RB REVISED AND LETTER DATED 6-8-71, WE WISH TO PURCHASE THE FOLLOWING."

A detailed list of "General Specifications" and "Included Items" was then typed on each of 7 pages. On the front of each page was printed the following:

> "This Purchase Order Is Subject To The Terms and Conditions Below and On The Reverse Side.
>
> PLEASE ACKNOWLEDGE THIS ORDER AT ONCE UPON ATTACHED COPY. This order is not binding until accepted. This order shall become a binding contract when Vendor executes and returns the attached Acknowledgment copy or ships any of the items, or renders any of the services, ordered herein. When accepted, the terms and conditions on the face and reverse sides of this order will constitute the complete agreement between Purchaser and Vendor. No additional or different terms that may be contained in Vendor's forms or otherwise proposed by Vendor will be binding upon Purchaser unless accepted in writing signed by Purchaser."

On the back of each page were buyer's "Terms and Conditions." In pertinent part these provided:

"PURCHASE ORDER

Terms and Conditions

1. ACCEPTANCE OF ORDER. This order is an offer to purchase upon the conditions and terms below and on the reverse side hereof and at the prices stated herein and may be withdrawn at any time prior to the actual receipt by Purchaser of Vendor's unconditional, written acceptance hereof. No modifications of, or exceptions to, any of the terms, conditions, or provisions of this order by vendor shall be of any effect unless and until accepted in writing by Purchaser. Any delivery (complete or partial) by Vendor pursuant hereto prior to actual receipt of Vendor's unconditional, written acceptance hereof, shall constitute Vendor's acceptance of this order in accordance with all terms, conditions, and provisions thereof.

* * *

6. WARRANTY. Vendor warrants all articles, material and work delivered hereunder to be free from any defect in labor, material, handling or fabrication. Vendor further warrants that he is aware of the intended use of all articles, materials, and components thereof, designed, specified or selected by him, and warrants that all such articles, materials and components thereof delivered hereunder are suitable and in a suitable condition for such use. The Warranties and guarantees herein are in addition to those otherwise provided or implied by law or customarily given by vendor with respect to equipment, work, materials or services substantially similar to items covered by this order."

On June 25, 1971, seller responded to the buyer's purchase order by returning a copy of the buyer's acknowledgment form, signed by Walter C. Johnson, Vice-President of Verson, as follows:

"ACCEPTED:

Verson Allsteel Press Company
(Vendor)

_____
Date

/s/ Walter C. Johnson
Walter C. Johnson
Vice-President—Marketing
Industrial Products."

The cover letter accompanying the acknowledgment provided:
"Gentlemen:
We acknowledge and express our sincere gratitude for your subject order, covering a #B-1110-250 and a #B-3010 Verson Major Series Press Brakes. The order has been entered in our production schedule for shipment of the B-1110-250 during the month of October, 1971, and the B-3010 during the month of November, 1971.

Based upon the previous correspondence, our formal proposal and your purchase order, the enclosed acknowledgment copies of our production orders give our terms, specifications, and pricing.

Point of operation guards are not included with these equipments. It is the employer's responsibility to provide guards, devices, tools, or other means to effectively protect all personnel from serious injury which may otherwise occur as a result of any particular machine use or activity. Again, please accept our thanks for your purchase order."

The maintenance manual delivered with the machine also stated that "Providing safe working conditions and safety devices are the sole responsibility of the user."

In 1974 an employee of the buyer was injured while operating the press, allegedly because of defects in the sufficiency of safety guards and warning devices on the press. He collected workmen's compensation benefits from the buyer and then sued the seller which settled for $300,000. Seller in turn sued buyer on the alleged indemnification agreement.[1]

At trial Johnson, seller's vice president, testified the price of the machinery did not vary with the inclusion or exclusion of the indemnification agreement. He also volunteered the statement that they would not sell the machine without such an agreement. Buyer's contracting officer testified that he was familiar with the purchase of this type of machine and that when some other press manufacturer had wanted a similar indemnification agreement, they refused. He could recall no other occasion in his 8½ years of employment at buyer's where a manufacturer had required an indemnification agreement as a condition of sale.

The trial court held that the buyer was bound by the indemnification agreement.

---

[1] Prior to 1977 Illinois did not permit a manufacturer held liable for a products liability injury to a buyer's employee to seek common-law indemnification from the employer of the employee for its negligence in maintaining or altering the machine. This rule was overturned in 1977 by the Illinois Supreme Court in *Stevens v. Silver Manufacturing Co.* (1977), 70 Ill. 2d 41, 374 N.E.2d 455, which held, however, that its ruling was prospective only. Accordingly, since the injury occurred in 1974, the seller cannot recover from the buyer unless it can prove a contractual right to indemnification.

I.

The rights of the parties are governed by section 2—207 of the Uniform Commercial Code (Ill. Rev. Stat. 1969, ch. 26, par. 2—207), which reads as follows:

> "(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
>
> (2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
>
> > (a) the offer expressly limits acceptance to the terms of the offer;
> >
> > (b) they materially alter it; or
> >
> > (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.
>
> (3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act."

The seller, relying on *Alan Wood Steel Co. v. Capital Equipment Enterprises, Inc.* (1976), 39 Ill. App. 3d 48, 349 N.E.2d 627, contends that the price quotation was an offer, although any contract was subject to approval by the home office; that since the price quotation was an offer the order must have been an acceptance of the offer; and that, therefore, the terms in the price quotation are binding.

We are not convinced, however, that *Alan Wood* is controlling. It is true that that case stated that the price quotation, which, like the price quotation in the present case, provided that no order was binding until acceptance by the seller, was an offer. However it does not appear from the case that this question had been litigated by the parties. Furthermore, the court in *Alan Wood* stated that the buyer orally accepted the offer by telephone before mailing the purchase order. Obviously, therefore, both parties in that case were treating the price quotation, not the purchase order, as the offer.

A price quotation, if sufficiently detailed as was the price quotation in the present case, may constitute an offer. (*CBS, Inc. v. Auburn Plastics,*

*Inc.* (1979), 67 App. Div. 811, 413 N.Y.S.2d 50; *Idaho Power Co. v. Westinghouse Electric Corp.* (9th Cir. 1979), 596 F.2d 924; *Falcon Tankers, Inc. v. Litton Systems, Inc.* (Del. Super. 1976), 355 A.2d 898; *Earl M. Jorgensen Co. v. Mark Construction, Inc.* (1975), 56 Haw. 466, 540 P.2d 978.) It does not follow, however, that a price quotation which is not binding when accepted by a buyer but only becomes binding if and when accepted by the seller, who is under absolutely no obligation to accept it, can by itself be treated as an offer. As defined by Black's Law Dictionary, 4th Edition, an offer is an act on the part of one person whereby he gives to another the legal power of creating the obligation called contract. See also 1 Williston on Contracts §25 (3d ed. Jaeger 1957). As stated in 1 Corbin on Contracts §11, at 24-25 (1963):

> "Assuming that an offer is made as a part of a business transaction and that it is made by a person possessed of full contractual capacity, what change in legal relations is brought about by the making of an offer? It is believed that the best short description of this change is that an offer creates a power of acceptance in the offeree. *It will not be disputed by any one that, after an offer is made, a voluntary expression of assent by the offeree is all that is necessary to create what we call contract.* This is what is meant, and it is all that is meant, by saying that an offer creates a power of acceptance in the offeree. The exercise of this power by the offeree will create a new and very important change in the legal relations of the parties. But the power to bring about this important change by the act of acceptance is itself an important juristic fact, and it is the legal result of the offer standing quite alone. For this reason, it seems to be reasonable and convenient to say that the offer may be an operative fact creating a new legal relation—*the relation of power in the offeree to create new changes in legal relations, with the correlative liability in the offeror that such a change will take place without any further action or expression on his own part.*
> What kind of act creates a power of acceptance and is therefore an offer? It must be an expression of will or intention. It must be an act that leads the offeree reasonably to believe that a power to create a contract is conferred upon him. This applies to the content of the power as well as to the fact of its existence. It is on this ground that we must exclude invitations to deal or acts of mere preliminary negotiation, and acts evidently done in jest or without intent to create legal relations. All these are acts that do not lead others reasonably to believe that they are empowered 'to close the contract.' So long as it is reasonably apparent that some further act of the offeror is necessary, the offeree has no power to create contractual relations by an act of his own, and there is as yet no operative offer." (Emphasis added.)

It follows that where the so-called offer is not intended to give the so-called offeree the power to make a contract there is no offer. As stated in Restatement of Contracts §25 (1932), if from a promise or manifestation of intention or from the circumstances existing at the time, the person to whom the promise or manifestation is addressed knows or has reason to know that the person making it does not intend it as an expression of his fixed purpose until he has given a further expression of assent, he has not made an offer.

■■ If the acceptance of a price quotation, sufficiently detailed to constitute an offer, is not binding on the seller because the time within which it could have been accepted has lapsed, the purchase order, not the price quotation, is treated as the offer since the purchase order did not create an enforceable contract. (*CBS, Inc. v. Auburn Plastics* (1979), 67 App. Div. 811, 413 N.Y.S.2d 50.) It is equally logical that where acceptance of a price quotation cannot, for some other reason, create an enforceable contract, the purchase order, not the price quotation, should be treated as the offer.

In *West Penn Power Co. v. Bethlehem Steel Corp.* (1975), 236 Pa. Super, 413, 426-27, 348 A.2d 144, 152, *allocatur refused*, the court refused to treat a proposal requiring acceptance by its home office as an offer since the clause was clearly intended to prevent formation of a contract by the unilateral action of the other party, saying:

> "The first legal issue involved in this conclusion concerns the validity of the 'Acceptance' clause. There can be no doubt about appellee's right to include this clause in its proposal to appellants, nor about the effect of the clause. The clause kept the proposal in effect for seven days but precluded the formation of a contract except upon approval by appellee's home office. Such a clause is valid in Pennsylvania under the common law of contracts. If the seller does not authorize the contract or accept the order within a reasonable time, the buyer may revoke its order, but there is no contract until the terms of the clause are met. *McCrea v. Automatic Heat, Inc.*, 161 Pa. Super. 545, 55 A.2d 564 (1947). 'The purpose of [the inclusion of such a standard acceptance clause] is that the negotiating agent shall have no power to bind his principal, and that expressions of agreement on the paper shall therefore be no more than an offer to be accepted or rejected by the principal at his pleasure.' 1 Corbin Contracts, §33, at 128-29 (1963)."

## II.

■■ Even if we were to treat the seller's price quotation as an offer and the buyer's purchase order as an acceptance (see, for example, *Earl M. Jorgensen Co. v. Mark Construction, Inc.* (1975), 56 Haw. 466, 540 P.2d 978), it does not follow under the facts in the present case that the provisions in

the seller's proposal would control. The seller unconditionally signed the buyer's acknowledgment form sent with the purchase order. The purchase order retained by the seller provided on its face above the purchaser's signature, in fairly large sized print, that when the order was accepted, the terms and conditions on the face and reverse sides of this order would constitute the complete agreement between the purchaser and vendor and that no additional or different terms contained in the vendor's forms would be binding on the purchaser. Where the seller signs the buyer's acknowledgment without expressly conditioning that signature, the seller accepts the conditions in the buyer's forms (*N & D Fashions, Inc. v. DHJ Industries, Inc.* (8th Cir. 1976), 548 F.2d 722; *Falcon Tankers, Inc. v. Litton Systems, Inc.* (Del. Super. 1976), 355 A.2d 898; *Southeastern Enameling Corp. v. General Bronze Corp.* (5th Cir. 1970), 434 F.2d 330, and compare *S. M. Wilson & Co. v. Smith International, Inc.* (9th Cir. 1978), 587 F.2d 1363), even though the price quotation contained a provision that the buyer by ordering any of the listed merchandise agreed to the enumerated conditions of sale. (*Falcon Tankers, Inc. v. Litton Systems, Inc.* (Del. Super. 1976), 355 A.2d 898.) The seller could, of course, have avoided this result by not signing the acknowledgment at all or by expressly conditioning the signature as did the seller in *Lincoln Pulp & Paper Co. v. Dravo Corp.* (D. Me. 1977), 445 F. Supp. 507, where the seller said on the acknowledgment that it was accepted in accordance with the accompanying letter, and the letter said conditions on back of form were not acceptable.

## III.

Furthermore, even if we were to treat the price quotation as an offer, it does not follow that the purchase order was necessarily an acceptance of that offer, despite the provision in the seller's condition of sale which, apparently, attempts to make any purchase order, regardless of its terms, an acceptance of all of the seller's terms. (Absent proper punctuation, it is impossible to decipher the precise meaning of paragraph 14.) While it is true that the offeror has total control over its own offer and may condition *acceptance* to the terms of the offer (Ill. Rev. Stat. 1969, ch. 26, par. 2—207(2)(a)), as apparently the seller did here, nevertheless it is not true that the first party to a sales transaction will always get his own terms. In most commercial transactions which party processes its terms first is purely fortuitous (*Southern Idaho Pipe & Steel Co. v. Cal-Cut Pipe & Supply, Inc.* (1977), 98 Idaho 495, 567 P.2d 1246, *appeal dismissed* (1978), 434 U.S. 1056, 55 L. Ed. 2d 757, 98 S. Ct. 1225), and "it must be recognized that the offeree should not be compelled to accept the terms of the offer if he does not want them, and he ought also to be free to respond with a counter-offer." 3 R. Duesenberg & L. King, Uniform Commercial Code Service (MB) §3.06[3] (1977).

■■ Under section 2—207(1) of the Uniform Commercial Code (Ill. Rev. Stat. 1969, ch. 26, par. 2—207(1)), any definite and seasonable expression of acceptance operates as an acceptance even though it is not a mirror image of the offer unless the acceptance is expressly made conditional on assent to the additional or different terms. However that section still requires a definite expression of acceptance and does not change the basic common-law requirement that there must be an objective manifestation of mutual assent. (*Ore & Chemical Corp. v. Howard Butcher Trading Co.* (E. D. Pa. 1978), 455 F. Supp. 1150.) No contract can be found where the offeror could not reasonably treat the response of the offeree as an acceptance (*Air Products & Chemicals, Inc. v. Fairbanks Morse, Inc.* (1973), 58 Wis. 2d 193, 206 N.W.2d 414), and parties may initially exchange printed forms which differ so radically that the second cannot be treated as an acceptance of the first. (*Koehring Co. v. Glowacki* (1977), 77 Wis. 2d 497, 253 N.W.2d 64.) Here the purchase order clearly, expressly and repeatedly stated that it was an offer to be accepted by the seller and that no contract existed until it was accepted by the seller. We cannot distort this definite expression of an offer into a "definite and seasonable expression of acceptance."

## IV.

■■ Seller's signing of the purchase order acknowledgment acted as an acceptance of the order. Indeed, the seller admitted this in its request to admit that "Verson Allsteel Press Company by Walter C. Johnson, Vice-President, accepted the purchase order and signed it on Page 1." Nor did seller dispute this point in its brief, although it was raised by the buyer. The mere fact that the seller enclosed its "Conditions of Sale" with the accompanying letter merely stating that enclosed copies gave its terms, specifications and pricing was not sufficient to make the acceptance a counteroffer instead of an acceptance, since to prevent such an assent from being an acceptance under section 2—207(1) it must be *expressly* made conditional on assent to the additional or different terms. This provision is construed narrowly to apply only to an acceptance which clearly reveals that the offeree is unwilling to proceed without agreement to the additional terms. *Idaho Power Co. v. Westinghouse Electric Corp.* (9th Cir. 1979), 596 F.2d 924; *Dorton v. Collins & Aikman Corp.* (6th Cir. 1972), 453 F.2d 1161, which held that even a statement that acceptance subject to all the terms and conditions on reverse side was not "expressly made conditional on assent to the additional or different terms."

Under section 2—207(2) of the Commercial Code the terms enclosed with the letter were merely to be construed as proposals for additions to the contract. They did not, however, become part of the contract since, as

the seller admits, they materially altered it. *Furtado v. Woburn Machine Co.* (Mass. Super. 1976), 19 U.C.C. Rep. Ser. 760.

### V.

■■ If we were to assume, contrary to the cases, that seller's acceptance was expressly made conditional on assent to the conditions set forth in its "Conditions of Sale," the result would still the be same. In that case, under section 2—207(1) of the Commercial Code the acknowledgment would act as a counteroffer, not an acceptance. (Compare *Tecumseh International Corp. v. City of Springfield* (1979), 70 Ill. App. 3d 101, 388 N.E.2d 460; *Koehring Co. v. Glowacki* (1977), 77 Wis. 2d 497, 253 N.W.2d 64; *Uniroyal, Inc. v. Chambers Gasket & Manufacturing Co.* (Ind. App. 1978), 380 N.E.2d 571.) Following this reasoning, since the only contract formed would be that formed by the parties' conduct, their rights would be controlled by section 2—207(3) of the Code. (*Bosway Tube & Steel Corp. v. McKay Machine Co.* (1975), 65 Mich. App. 426, 237 N.W.2d 488.) This section provides that the terms of the particular contract consist of those on which the *writings* of the parties agree and the code provisions. It is well established that under this provision terms contained only in one of the party's forms are not part of the contract. *Uniroyal, Inc. v. Chambers Gasket & Manufacturing Co.* (Ind. App. 1978), 380 N.E.2d 571; *C. Itoh & Co. (America) Inc. v. Jordan International Co.* (7th Cir. 1977), 552 F.2d 1228; *Bosway Tube & Steel Corp. v. McKay Machine Co.* (1975), 65 Mich. App. 426, 237 N.W.2d 488.

### VI.

■■ The seller argues, however, that the court's finding was proper because the parties intended to make the indemnity clause part of the contract, pointing to the testimony of seller's marketing vice-president that seller would never have sold the press without the indemnity provision. There is absolutely no evidence in the record that this intent was communicated to the buyer. To the contrary, the only evidence in the record is that there was no discussion between the parties regarding the indemnification of the seller. As stated by the court in *Earl M. Jorgensen Co. v. Mark Construction, Inc.* (1975), 56 Haw. 466, 470-71, 540 P.2d 978, 982:

> "The existence of mutual assent or intent to accept is determined by an objective standard. * * * Unexpressed intentions are nugatory when the problem is to ascertain the legal relations, if any, between two parties."

■■■ Seller, however, contends that the terms of the "Conditions of Sale" were incorporated into the buyer's order by the language "in accordance with your quotation Proposal No. 5575-1-RB Revised and letter dated

6-8-71," relying on the well-established axiom that typewritten provisions prevail over printed ones. This rule is applicable only where there is a conflict between typed and printed portions of a document. (*Illinois Valley Asphalt, Inc. v. La Salle National Bank* (1977), 54 Ill. App. 3d 317, 369 N.E.2d 525.) A contract must be read as a whole (*National Aircraft Leasing, Ltd. v. American Airlines, Inc.* (1979), 74 Ill. App. 3d 1014, 394 N.E.2d 470), and neither the printed portion nor the typewritten portion should be disregarded unless there is a conflict between the two. Rather, a typewritten provision of a contract should prevail over inconsistent printed stipulations only as far as it is apparent that the parties intended to modify or disregard such printed stipulations, and where the antagonism is merely apparent, the difference should be reconciled, if possible, by any reasonable interpretation. (12 Ill. L. & Prac. *Contracts* §227 (1955).) Reading the purchase order as a whole it is clear the general phrase "in accordance with" was intended only to identify the pertinent price quotations and not to incorporate the "Conditions of Sale" attached to only one of those quotations in direct conflict with the many provisions of the purchase order specifically stating that the seller's conditions were not binding.

■■ The seller also contends that the buyer is bound by the indemnity provision because it failed to object to it. The indemnity provision only appeared in the "Conditions of Sale" which, as we have already determined, did not become part of the contract. The other notices sent to the buyer repeatedly informed the buyer that the responsibility for installing safety devices was on the buyer but did not contain an indemnification clause. Such unobjected-to notice might be construed as modifying the contract so as to remove any warranties relating to the safety of the machine, but obviously could not be considered to change the contract to add an indemnification clause never referred to in such notice. To the contrary, an indication that the seller was not relying on any indemnification clause is the fact that while the notices reaffirmed the buyer's duty to install safety devices, a duty first mentioned in the "Conditions of Sale," they failed to make any reference to the indemnification clause also in the same conditions. Since the accident occurred before the decision in *Stevens v. Silver Manufacturing Co.* (1977), 70 Ill. 2d 41, 374 N.E.2d 455, the claim does not and cannot arise out of the buyer's failure to install effective devices. It can arise only if the buyer did in fact agree "to indemnify * * * Verson * * * against any and all loss, damage, expense, claims, suits or liability which Verson * * * may sustain or incur at any time for or by reason of any injury to or death of any person or persons or damage to any property, arising out of any claimed improper design or manufacture of the goods sold hereunder, or any claimed, inadequate or insufficient safeguards or safety devices."

Since we believe it is clear as a matter of law that the indemnification clause cannot be found to be part of the contract agreed upon by the parties, the judgment of the trial court is reversed.

Reversed.

LINN, P. J., and JIGANTI, J., concur.