2022 IL App (1st) 210391-U

No. 1-21-0391

Order filed May 12, 2022

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THOMPSON FINE ART, LTD., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 21 CH 502 |
| | ) | |
| UNION LEAGUE CLUB OF CHICAGO, | ) | Honorable |
| | ) | Neil H. Cohen, |
| Defendant-Appellee. | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Reyes and Justice Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court properly granted defendant's motion for judgment on the pleadings where plaintiff failed to sufficiently plead claims of breach of contract and fraud.

¶ 2    In this case involving the potential sale of a painting by Claude Monet known as *Pommiers en Fleur*s, the trial court entered judgment in favor of defendant Union League Club of Chicago. On appeal, plaintiff Thompson Fine Art Limited argues that the trial court erred in entering judgment on the pleadings in favor of defendant on both the breach of contract and fraud claims.

¶ 3    For the reasons that follow, we affirm the judgment of the circuit court.[1]

¶ 4                                   I. BACKGROUND

¶ 5    Thompson Fine Art Limited (Thompson) is a business which specializes in providing services in connection with fine art, antiquarian books, and antiques. Thompson's clients include wealthy private individuals, owners of significant real estate who display fine art, museums, and art galleries. Union League Club of Chicago (the Club) is a 501(c)(7) nonprofit organization. The Club operates a historic private social club and is home to one of the most significant private art exhibits in the Midwest. The Club is the owner of *Pommiers en Fleurs*, a Claude Monet painting completed around 1872. Prior to December 2020, the painting had been valued at approximately $5.1 million.

¶ 6    The following are the individuals involved in this dispute. The general manager of the Club was Mark Tunney. Nancy Ross was the Club's president. Member A was a long-time Club member who knew of the Club's financial difficulties due to the Covid-19 pandemic. Member A also had relationships in the art world and could locate buyers to purchase artwork.

¶ 7    Member A approached Ross in her capacity as the Club's president about selling the Monet painting. On or about December 17, 2020, Ross informed Member A that the Club's board of directors had "agreed to sell immediately the Monet Painting for the highest and best offer above $6.5 million, provided that the purchaser would continue to allow the Monet Painting to be displayed at the Art Institute of Chicago in conformance with pre-existing arrangements between

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

[the Club] and the Art Institute." Member A asked that the Club send a formal offer to sell the painting so that Member A could forward the offer to prospective purchasers.

¶ 8    On January 12, 2021, Tunney sent an email to Member A with the subject line "Request for Proposals." The email in full read:

> "Good afternoon:
> The Union League Club Board is meeting this week to review and consider proposals for the purchase of the ULCC's Monet.
> You have indicated that you or a party you know have an interest in purchasing the Monet.
> Due to various time constraints, we are asking you to submit your best and final offer on Thursday, January 14th by 5pm CST.
>
> Include in your offer the following information:
> - Amount of offer and net proceeds to the Seller
> - Timetable for consummating sale and transfer of funds
> - Caveat: the buyer will not be able to take possession of the Monet until the end of its existing loan, to the Art Institute of Chicago for its current Monet exhibit[], including any extensions[.] The buyer must be willing to purchase the Monet before the end of the Exhibit and continue the loan to the Art Institute.
> - Does the buyer have adequate readily available funds to consummate the purchase? If so, provide supporting information.
> - Any other buyer conditions.
>
> Please submit the proposal to President Nancy Ross with a copy to me.
> We may have follow up questions and ask for the best way to reach you."

The email included Tunney's signature block but not an actual signature. Member A then provided Tunney's email to third parties.

¶ 9    On January 15, 2021, attorney Sam Saad sent a letter to Ross on behalf of Thompson. The letter read in full:

"Dear Nancy,

Thompson Fine Art Limited offer of purchase from Chicago Union Club Claude Monet (1840-1926) – *Pommiers in fleurs* (Apple Trees in Blossom) 1872

We act for Thompson Fine Art Limited.

We are instructed to make an offer on behalf of our client for the purchase of the following work of art (the "Work"):

| | |
|---|---|
| Artist: | Claude Monet (1840-1926) |
| Title: | *Pommiers en fleurs* (Apple Trees in Blossom) 1872 |
| Medium: | Oil on canvas |
| Dimensions: | 57.5 x 69.5 cm |

Our client has a written offer to purchase from a credible purchaser whom our client has transacted with on numerous occasions and who has a significant private collection that is on public display. Our client has verified that the necessary funds required to purchase the Work are readily available.

The offer of purchase is as follows:

1. Purchase price of USD $7,200,000 (Seven Million AND Two Hundred Thousand United States Dollars);

2. If the offer is accepted, the purchase is subject to the parties entering into a written sale and purchase contract in relation to the Work;

3. Our client's purchaser does not require a viewing of the Work; and

4. The Work is to remain in The Art Institute, Chicago for the exchange after contracts have been signed and will remain in the Art Institute, Chicago until the exhibition is complete.


The offer is open for acceptance until 5 p.m. CST Friday 15 January 2021 and request that a response to our offer be provided prior to this time.

If the offer is acceptable and you agree with [the] terms offered, please counter sign below and return this document to us."

The letter concluded with Saad's signature and an empty line for Ross's signature.

¶ 10    Ross later informed Member A that the Club did not intend to go forward with the transaction. Ross never signed or responded to Saad's letter.

¶ 11    Thompson filed suit in the circuit court of Cook County alleging breach of contract and fraud. Thompson alleged in count 1 that Tunney's email constituted an offer and that Saad's letter constituted an acceptance. Thompson claimed that those two documents contained all necessary terms and, taken together, constituted an enforceable agreement. Because the painting is a one-of-a-kind piece of art, Thompson requested an order of specific performance.

¶ 12    Count 2 alleged fraud. Thompson claimed Tunney's email provided for and required a fair sales process by which the highest bidder who complied with the email and price requirements would be sold the painting. Thompson alleged that the Club undertook a scheme to offer the painting for sale for the purpose of obtaining offers to assist in efforts to refinance its loans, to modify existing loans, or to obtain offers outside of the agreed sales process. Thus, according to Thompson, the statements contained in Tunney's email and Ross's statement regarding the acceptable sales price were false statements, part of a scheme to defraud individuals who offered to purchase the painting. Thompson concluded that because of the Club's false statements, it submitted a bid of $7.2 million, which was rejected without explanation. Thompson requested damages in an amount to be determined at trial.

¶ 13    Attached to the complaint were three exhibits. Exhibit 1 was a news article from artnews.com. The article quoted Ross confirming that the Club's board had approved the sale of the painting. The article also discussed the process of the sale for the Monet and other paintings. The article explained that Tunney had confirmed that two caches of artwork had been selected by the Club's task force. The Club's hope was that the first cache of works would generate enough

revenue so that the Monet painting could stay in the Club's hands. Exhibit 2 was Tunney's email and Exhibit 3 was Saad's letter, both of which are laid out in full above.

¶ 14 The Club moved for judgment on the pleadings pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2020)). The Club argued that there was no contract because Tunney's email was a request for a "best and final offer" as opposed to an offer. The Club further argued that Exhibit 3, Saad's letter, was not an acceptance. Instead, Saad's letter constituted an offer as it used the terms "offer" and "offered" ten times. Further, citing Illinois' mirror image rule, the Club argued that a contract was never formed where Ross never countersigned and returned Saad's letter. Finally, on count 1, the Club argued that application of the statute of frauds resulted in no enforceable contract because there was no written agreement signed by a representative of the Club.

¶ 15 On count 2, the Club argued that there was only a single statement of fact in Tunney's email, that the board was to meet to review and consider proposals for the purchase of the painting. The remaining statements were solicitations of an offer which contained no factual assertions. The Club also argued that Thompson could not have reasonably relied on Tunney's email because Tunney stated that the board was to meet later to review and consider proposals, which meant no decision to sell had been made. Exhibit 1, the news article which predated Tunney's email, also defeated Thompson's alleged reliance because the article explained the Club's hope that revenue from the sale of other paintings would allow the Club to retain the Monet painting. The Club requested that the circuit court grant judgment on the pleadings or dismiss both counts of the complaint.

¶ 16 Thompson responded to the Club's argument as follows. Ross's statement and Tunney's email together constituted an offer that had not been revoked. The two contained essential terms,

a price of more than $6.5 million, the means of payment, additional terms concerning the Art Institute's possession, and a deadline. The purpose of the two communications was to promise to sell the painting, which constituted an offer. Thompson argued that considering Saad's letter an offer merely because it used the term "offer" numerous times would place form over substance. In substance, Saad's letter was an acceptance.

¶ 17     Thompson argued that the mirror image rule did not apply because it was rejected by the Uniform Commercial Code[2] and that, even if applied, a contract was formed because Saad's letter matched precisely with Ross's statements and Tunney's email. Regarding the statute of frauds, Thompson argued that (1) Tunney's signature block was sufficient to constitute a signature of the Club, and (2) considering all of the documents together, the Club had signed a document expressing its intent to sell the painting to which Thompson accepted.

¶ 18     On the fraud claim, Thompson responded that it was alleging a "fraudulent scheme based on future promises" to sell the painting, a claim which included the representations of both Ross and Tunney. Finally, Thompson reasonably relied on the Ross and Tunney statements, which would lead a reasonable person to believe that the painting was for sale, the Club was ready and able to sell, and a sale would occur provided a purchaser agreed to pay above $6.5 million and comply with the other requirements of Tunney's email. Thompson asked the court to deny the Club's motion for judgment on the pleadings.

---

[2] The mirror image rule is a "basic rule of contract formation *** requiring that the acceptance strictly comply with the terms set forth in the offer." *Hubble v. O'Connor*, 291 Ill. App. 3d 974, 980 (1997). Article 2 of the Uniform Commercial Code (UCC) applies here as it is a sale of goods. 810 ILCS 5/2-102 (West 2020). Section 2-207 of the UCC superseded the mirror image rule in some respects. Section 2-207 allows for a "definite and seasonable expression of acceptance" to operate "as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms."

¶ 19    The Club filed a reply in support of its motion for judgment on the pleadings. Regarding Thompson's argument that Ross's statements provided the price, the Club responded that (1) Ross's statements should not be considered because they were inconsistent with Tunney's email, (2) Ross's statements were too vague to be an offer because they did not contain a price term that could be accepted without the proposal of a new term, (3) Ross's statements, even if an offer, were extinguished, replaced, amended, and superseded by Tunney's email, and (4) considering Ross's and Tunney's communications together does not work because they contradict each another. The Club argued that Saad's letter could not be an acceptance as it used the terms "offer" or "offered" ten times and invited the Club to accept by requiring a countersignature and return.  Regarding the statute of frauds, the Club argued that Thompson could not rely on Ross's oral statements to satisfy the offer element of a contract while simultaneously relying on Tunney's signature block in the email, which was not independently an offer. On the fraud claim, the Club argued that Exhibit 1, the news article, defeated any reliance argument because it made clear the Club's desire to retain the painting.

¶ 20    The trial court granted the Club's motion on the pleadings. On count 1, the trial court concluded that, as a matter of law, no contract was formed. Regarding both Ross's statements and Tunney's email, the court held that the communications were no more than a solicitation of an offer or an invitation for offers. As to acceptance, the trial court held that because there was no offer, there was nothing for Thompson to accept. Moreover, Saad's letter plainly and unambiguously stated it was an offer. Because Saad's letter was the only offer of record, Thompson needed to allege that the Club had accepted that offer, but Thompson had made no such allegation. Count 2 was also deficient because Thompson had pointed to no false statements in Tunney's email, which stated only that the board planned to meet and consider proposals for the

sale of the painting. The trial court's order was entered on March 17, 2021. Thompson filed its notice of appeal on April 7, 2021.

¶ 21                                    II. ANALYSIS

¶ 22    Section 2-615 of the Code (735 ILCS 5/2-615(e) (West 2020)), provides that "[a]ny party may seasonably move for judgment on the pleadings." "Judgment on the pleadings is proper if the pleadings disclose no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." *Lebron v. Gottlieb Memorial Hospital*, 237 Ill. 2d 217, 227 (2010). "In ruling on a motion for judgment on the pleadings, the court will consider only those facts apparent from the face of the pleadings, matters subject to judicial notice, and judicial admissions in the record." *Gillen v. State Farm Mutual Automobile Insurance Co.*, 215 Ill. 2d 381, 385 (2005). "All well-pleaded facts and reasonable inferences therefrom are taken as true." *Id.* "We review the grant of judgment on the pleadings *de novo*." *Pekin Insurance Co. v. Wilson*, 237 Ill. 2d 446, 455 (2010).

¶ 23                              A. Breach of Contract

¶ 24    Thompson first contends that the trial court erred in determining as a matter of law that no contract existed in this case. "In Illinois, an offer, an acceptance and consideration are the basic ingredients of a contract." *Melena v. Anheuser-Busch, Inc.*, 219 Ill. 2d 135, 151 (2006). The dispositive issue here is whether the Club ever made an offer to sell the painting. If not, there was no contract between the parties. "Where there is no dispute as to facts essential to a purported contract, the question of its existence is solely a matter of law for determination by the court." *Bank of Benton v. Cogdill*, 118 Ill. App. 3d 280, 288 (1983).

¶ 25    "[A]n offer is an act on the part of one person whereby he gives to another the legal power of creating the obligation called contract." *McCarty v. Version Allsteel Press Co.*, 89 Ill. App. 3d 498, 507 (1980). "[A]n offer creates a power of acceptance in the offeree." 1 Corbin on Contracts,

§ 11, pgs. 24-25. "Power of acceptance" means that "a voluntary expression of assent by the offeree is all that is necessary to create what we call [a] contract." *McCarty*, 89 Ill. App. 3d at 507. A communication "is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent." Restatement (Second) of Contracts § 26; *McCarty*, 89 Ill. App. 3d at 507.

¶ 26    Neither Ross's statements nor Tunney's email, taken alone or together, constitute an offer. Ross merely stated that the Club's board had internally agreed to sell the painting for "the highest and best offer above 6.5 million USD." Implicit within that statement are two key points. First, a prospective purchaser would have to make an offer. Second, there would need to be a determination by the Club as to which offer was the "highest and best." Because a "further manifestation of assent" was required by the Club, no reasonable person in Thompson's position could have viewed Ross's statements as an offer.

¶ 27    Tunney's email similarly does not constitute an offer. The email contains numerous hallmarks of an invitation to deal. The subject line of the email stated, "Request for Proposals," and Tunney asked that any interested party "submit [their] best and final offer." Restatement (Second) of Contracts § 26 illus. d. ("The words 'Make me an offer' would normally indicate that no offer is being made."). Tunney further stated that the board was meeting during the week to "review and consider proposals for the purchase of the ULCC's Monet." As with Ross's statements, no "power of acceptance" was created in Thompson because the Club would need to "review and consider" any proposal. *See Bank of Benton*, 118 Ill. App. 3d at 288. Finally, Tunney requested the interested party's contact information in the event the Club had questions.

¶ 28    Thompson's actions through the Saad letter further support the conclusion that the Club never made an offer. The letter is described as an offer numerous times. The letter speaks of the

potential for the Club to accept the offer. The letter concluded that if "the offer is acceptable and you agree with [the] terms offered, please counter sign below and return this document to us." The letter included a line for Ross to sign on behalf of the Club. Restatement (Second) of Contracts § 26 cmt. d ("A standard method of making an offer is to submit to the offeree a written agreement signed by the offeror and to invite the offeree to sign on a line provided for that purpose."). Finally, Saad's letter was the first time a definitive price was proposed, which is an essential term of a contract. See *Prignano v. Prignano*, 405 Ill. App. 3d 801, 816 (2010) (explaining that essential terms of a contract include price and the items to be delivered for that price).

¶ 29    We can affirm the trial court's decision without resolution of the parties' arguments surrounding the statute of frauds and the mirror image rule. Even assuming Ross's oral statements should be considered, and that Tunney's signature block constituted a signature, there was still no offer from the Club. At best, the communications jointly could be viewed as the solicitation of an offer. See *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 250 (3d Cir. 2007) (explaining that where communications do not generate an understanding that another party's "assent to that bargain is invited and will conclude it," the communications are considered "not as offers, but as invitations to make offers"); *Steinberg v. Chicago Medical School*, 69 Ill. 2d 320, 330 (1977). In other words, Thompson could not merely assent to conclude the deal. Instead, the Club would have to take further action before a contract was formed.

¶ 30    In short, because "there was never a meeting of the minds as to the price the plaintiff was willing to pay for the [painting] and the price the defendant was willing to accept, there was no contract between the parties." *Burkhart v. Wolf Motors of Naperville, Inc. ex rel. Toyota of Naperville*, 2016 IL App (2d) 151053, ¶ 18. "No offer and no acceptance mean no contract."

*Fletcher-Harlee Corp.*, 482 F.3d at 251. The trial court properly granted the Club's motion for judgment on the pleadings on Thompson's breach of contract claim.

¶ 31                                    B. Fraud

¶ 32     Thompson also contends that the trial court improperly granted the Club's judgment on the pleadings as to its fraud claim.  Thompson argues that it "alleged a fraudulent scheme based on future promises to sell" the painting. Thompson relies on two communications: (1) Ross's statement that the Club would immediately sell the painting for the highest and best offer above $6.5 million, and (2) Tunney's email requesting proposals and stating that the board would meet to review and consider the proposals. By these two statements, Thompson argues that the Club undertook a scheme to obtain offers in an effort to refinance its loans or "perhaps" to modify existing loans or obtain better offers outside of the agreed sales process.

¶ 33     "The elements of common law fraud are: (1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 497 (1996). "In the context of common law fraud, the law presumes that transactions are fair and honest; fraud is not presumed." *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 191 (2005). "Accordingly, fraud must be proved by clear and convincing evidence." *Id*. "It is well established that fraud-based claims demand a higher standard when it comes to pleadings, as there must be specific allegations of facts to support the claim." *Castlerigg Master Investments, Ltd. v. AbbVie, Inc.*, 2021 IL App (1st) 200527, ¶ 20.

¶ 34     The general rule is that "a promise to perform an act, though accompanied at the time with an intention not to perform it, is not such a false representation as will constitute fraud sufficient

to predicate thereon a cause of action." *Roda v. Berko*, 401 Ill. 335, 340 (1948). The rationale for the rule is that if an individual makes a promise to act, accompanied by an intent not to perform the act, and the other party is induced to enter an agreement based on the promise, the remedy lies in a breach of contract. See *Gage v. Lewis*, 68 Ill. 604, 616 (1873). If the aggrieved party is unable to establish a breach of contract, there is no remedy. Here, Ross's statement that the Club would sell the painting for the highest and best offer and Tunney's statement that the Club would review and consider proposals both amounted to promises to act in the future. Thus, the statements cannot form the basis of a fraud claim.

¶ 35    To be sure, as Thompson points out, there is an exception to the general rule where the false promise of intention "is the scheme or device to accomplish the fraud and thereby cheat and defraud another of his property." *Roda*, 401 Ill. at 340. In that situation, "equity will right the wrong by restoring the parties to the positions they occupied before the fraud was committed." *Id*. Cases invoking the exception universally involve both a definitive commitment on behalf of the fraud victim and resultant damage. See *Henderson Square Condominium Ass'n v. LAB Townhomes, LLC*, 2015 IL 118139, ¶ 69 (holding that fraud was sufficiently alleged where the defendants had made false representations in a scheme to induce the owners to purchase the units so that the defendants could profit, that the owners relied on the representations, and that the owners would not have purchased the units had they known the units contained multiple and significant defects); *Vance Pearson, Inc. v. Alexander*, 86 Ill. App. 3d 1105, 1112 (1980) (holding that a fraud claim was sufficiently alleged where the defendant made a false promise to perform by a date certain, intending not to perform by that date but intending that the plaintiff rely on the promise, and the plaintiff did rely on the promise to his detriment in the way of significant costs in transporting crops to be weighed at a different location).

¶ 36    Here, unlike the cases invoking the exception, Thompson did not take a definitive action to its detriment. Thompson merely made an offer to buy the painting, which was not accepted. There is no remedy for fraud because Thompson is already in the same position as it was before the Club declared an intention to sell.  As there is nothing to remedy, the exception does not apply and Thompson's sole remedy rested in a breach of contract claim.

¶ 37    Thompson also cannot establish reliance on either Ross's statement or Tunney's email. Thompson argues that it "relied upon the materially false statement (that the Monet Painting would be sold) and retained an attorney to assist with the acquisition based on its reasonable belief that the Monet Painting would be sold, as stated by Ross." Thompson's implicit claim is that Ross's statement constituted the creation of an auction without reserve, wherein the Club would be bound to sell the painting to the highest bidder, regardless of whether the Club found the bid satisfactory.

¶ 38    Thompson's claim is contrary to Illinois law. Section 2-328 of the Uniform Commercial Code (810 ILCS 5/2-328 (West 2020)), governs auction sales. The statute provides that an auction sale is "with reserve unless the goods are in explicit terms put up without reserve." *Id*. "In an auction with reserve the auctioneer may withdraw the goods at any time until he announces completion of the sale." *Id.* "In an auction without reserve, after the auctioneer calls for bids on an article or lot, that article or lot cannot be withdrawn unless no bid is made within a reasonable time." *Id.* Thus, the general rule is that a seller can withdraw an item from sale either before or during an auction.

¶ 39    Ross's statement that the Club would sell to the "highest and best" bid did not amount to the creation of an auction without reserve. See *Wells Fargo Bank, N.A. v. Holdco Asset Management, L.P.*, 729 Fed. App'x. 124, 126 (2d Cir. 2018) (holding that, under New York law

which mirrors Illinois law, an invitation to bid stating that each item "will be awarded only to the best bidder who is also a qualified bidder," did not create an auction without reserve); *Restaurant Supply, LLC v. Giardia Limited Partnership*, 330 Conn. 642, 650-651 (2019) (holding that a request for an interested party's "highest and best offer" did not bind the seller to accept the highest offer). Under Illinois law, any bid for the painting would have been an offer subject to the Club's acceptance. See *Well v. Schoeneweis*, 101 Ill. App. 3d 254, 258 (1981) ("The fundamental rule at common law, and now incorporated into statute insofar as chattels are concerned, is that a bid at an auction constitutes an offer to buy."). The Club was free to reject Thompson's offer, accept another offer, or decide not to sell the painting. If Thompson relied on Ross's statement in concluding that the Club was bound to sell the painting, that reliance was unreasonable. See *Sly v. First National Bank of Scottsboro*, 387 So. 2d 198, 200 (Ala. 1980) (holding that a potential buyer unreasonably relied on the seller's declaration that the property would sell to the "highest, best and last bidder").

¶ 40     Further lessening any potential reliance Thompson could have had is Tunney's subsequent email, which spoke in much less concrete language, and contemporaneous statements made by Tunney that were reported in a news article. Tunney's email stated only that the board would meet to "review and consider" proposals. The email solicited any interested party's "best and final offer," while requesting contact information because Ross and Tunney "may have follow up questions." Tunney's email is clearly not a communication purporting to bind the Club to sell the painting regardless of the acceptability of the bid. The news article, published shortly before Ross's initial communication with Member A, reported that Tunney stated that plans to sell the painting were "not finalized" and that the hope was for enough revenue to be generated so that the Club

could retain the painting. The totality of the circumstances here establish that Thompson could not have reasonably relied on Ross's and Tunney's communications in concluding that the Club was bound to sell the painting.

¶ 41    Thompson's complaint suffers from one more fatal defect. The complaint does not adequately allege damages. "Damage is an essential element of fraud." *City of Chicago v. Michigan Beach Housing Cooperative*, 297 Ill. App. 3d 317, 323 (1998). Thompson's claim of damages in the complaint is that it had "been damaged in an amount to be determined at trial, but which should include compensatory damages and punitive damages and the imposition of attorney fees."  "Absolute certainty about the amount of damages is not necessary, but damages may not be predicated upon mere speculation, and the plaintiff must show a *basis* for computing damages with a fair degree of probability." *Castlerigg Master Investments*, 2021 IL App (1st) 200527, ¶ 23 (emphasis in original).  Thompson's claim of damages is almost identical to the claim of damages that this court found insufficient in *Castlerigg*. *Id*. (finding damages insufficiently pled where the plaintiff sought compensatory damages, punitive damages, and interest "in an amount to be determined at trial").

¶ 42    On appeal, Thompson claims that it has "been deprived of a one of a kind piece of art." However, that damage could only be remedied through specific performance, which as discussed above, is not warranted in this case. Any claim of damage through the expense of preparing the offer would similarly be unavailable because, as just discussed, the Club had a legal right to withdraw the painting from sale at any time before contract formation. See *Benjamin v. First Citizens Bank & Trust Co. of Utica*, 248 A.D. 610, 610 (N.Y. App. 1936). Because Thompson

failed to adequately plead damages, the trial court properly granted the Club's judgment on the pleadings.

¶ 43                      III. CONCLUSION

¶ 44     For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 45     Affirmed.