DONALD E. BARLIANT, d/b/a Mayuba Book Stores, Plaintiff-Appellant, v. FOLLETT CORPORATION, Defendant-Appellee.

First District (2nd Division) No. 84—0760

Opinion filed September 24, 1985.

Patrick E. Mahoney, of Patrick E. Mahoney & Associates, P.C., of Chicago, for appellant.

Eugene L. Resnick, Mark A. Lies II, and John H. Anderson, all of Seyfarth, Shaw, Fairweather & Geraldson, of Chicago, for appellee.

JUSTICE BILANDIC delivered the opinion of the court:

Plaintiff-appellant Donald E. Barliant brought a class-action suit against defendant-appellee Follett Corporation, alleging that Follett had overcharged for its shipments of books. Specifically, Barliant claimed that the terms of sale were F.O.B. seller's warehouse in Chicago and that Follett breached those terms by adding a charge designated as "BKPST TRANS-INS" (bookpost, transportation, and insurance) to its invoices without notifying its customers. After a bench trial, in which only the issue of liability was litigated, the court found that Barliant had failed to prove his case, and it entered a judgment in favor of Follett. The issue is whether the court's findings were against the manifest weight of the evidence.

Barliant is an attorney and the owner of two bookstores in Chicago who filed suit against Follett on June 6, 1972. He alleged that Follett's terms of sale, published in its catalogues and order forms, and consistent with the custom and usage in the industry, were F.O.B. Follett's warehouse in Chicago. Pursuant to these terms, Barliant bought books from defendant and reimbursed it for the costs of transportation from the warehouse to the stores.

Barliant also alleged that on or about January 1, 1971, Follett began to include in its invoices a charge that was higher than the rates

charged by the Postal Service for its bookpost (4th class) delivery. Barliant claimed that this was done without defendant's changing its published terms of sale. Follett claimed that the change was instituted because it switched to computerized billing, the "pre-bill" system. Under this system, Follett weighs each book and enters the information in its computer. When an order is received, the order is picked in the warehouse, and the computer then calculates the weight of the books and estimates the weight of the packing material—the paper carton, the filler, etc. The computer also selects the shipping method unless the buyer specifies it.

Barliant paid all the invoices that contained the "BKPST TRANS-INS" charge from January 1971 to May 1972, the date when he discovered the alleged overcharge after reading a newspaper article. Barliant demanded a refund from Follett, which was refused, and Barliant then filed suit, claiming that the extra charge was an attempt to increase the price of books. The complaint alleged breach of contract, fraud, and deceptive trade practices within the meaning of the Uniform Deceptive Trade Practices Act. (Ill. Rev. Stat. 1971, ch. 121½, par. 311 et seq.) Barliant prayed for an accounting, the appointment of a receiver, temporary and permanent injunctions, compensatory and punitive damages, costs and attorney fees, and other appropriate relief.

The case was assigned to Judge Charles R. Barrett, who found that the class—on behalf of all purchasers of the defendant who were billed "BKPST TRANS-INS"—was proper and that the complaint stated a good cause of action. Several months later, the State of Illinois intervened on behalf of a subclass of all public institutions that had bought books from defendant. In December 1972, this case was consolidated with another class action, Avery Coonley School v. Follett Corp.

After Judge Barrett was elevated to the appellate court, the case was reassigned to Judge Emmett F. Morrisey. In December 1975, the Avery Coonley suit was settled, and a month later, the Attorney General and Follett settled their dispute, and that action was dismissed.

After Judge Morrisey became ill, the case was reassigned to Judge Joseph M. Wosik, who dismissed the class action allegations. We affirmed. (Barliant v. Follett Corp. (1977), 53 Ill. App. 3d 101, 368 N.E.2d 654.)[1] Our supreme court, however, reversed and rein-

---

[1]In a related suit, we affirmed an order that granted another defendant's motion to dismiss a class action. Barliant v. Harcourt Brace Jovanovich, Inc. (1978), 56 Ill. App. 3d 974, 372 N.E.2d 861.

stated the class action, holding that the order vacating the class action three years after a determination was made was improper and that the requirements of a class action were satisfied. The circuit court was also required to determine whether the 18-month delay in Barliant's giving notice to Follett, as required by the Uniform Commercial Code (Ill. Rev. Stat. 1971, ch. 26, par. 2—607(3)(a)), was so unreasonable as to require Barliant's dismissal as the class representative. *Barliant v. Follett Corp.* (1978), 74 Ill. 2d 226, 384 N.E.2d 316.

On remand, Judge Albert Green found that the firm that presently represents the class is qualified and that Barliant's delay in notifying defendant of the alleged breach was not unreasonable. Follett filed an amended answer and counterclaim on December 16, 1980, alleging as an affirmative defense that its billing for transportation charges was in conformity with industry custom. Follett admitted that it sold books on an F.O.B. basis and argued that, if plaintiffs prevailed, Follett would be entitled to reimbursement for the books that had been lost in transit and replaced by the defendant.

In his answer to the counterclaim, Barliant claimed that the use of trade in the industry was that a publisher replaces or gives a credit for books that are billed but not delivered. The trial, on the issue of liability only, began on July 26, 1983, and was continued from time to time until its conclusion on November 10, 1983.

On February 27, 1984, the court entered its findings. It found that Barliant "failed to submit any evidence that the custom and usage in the publishing industry was to ship all books by bookpost without any form of insurance, or handling [and] packaging charges." The court also found that Barliant's testimony—that he did not remember seeing the notation "BKPST TRANS-INS" on any invoice from January 1971 to May 1972—to be "incredible" because the evidence showed that Barliant examined invoices before signing the checks. Barliant also failed to answer any questions about shipments made by other publishers, and his method of calculating damages did not coincide with postal rates. In sum, the court concluded that Barliant failed to prove a breach of contract or any other type of liability. The court also found that Follett did not prove its counterclaim. Only Barliant appealed the judgment.

A reviewing court will not disturb a lower court's findings of fact unless they are against the manifest weight of the evidence. (*Brown v. Zimmerman* (1959), 18 Ill. 2d 94, 102, 163 N.E.2d 518.) For a finding to be against the manifest weight of the evidence, it must appear that a conclusion opposite to that reached by the trial court is clearly apparent. *Emmenegger Construction Co. v. King* (1982), 103 Ill. App.

3d 423, 427, 431 N.E.2d 738.

There is no dispute that the terms of sale that appeared in Follett's catalogues were "F.O.B. seller's warehouse in Chicago." Section 2—319 of the Uniform Commercial Code defines the terms as follows:

> "Sec. 2—319. F.O.B. and F.A.S. Terms
>
> (1) Unless otherwise agreed the term F.O.B. (which means "free on board") at a named place, even though used only in connection with the stated price, is a delivery term under which
>
> > (a) when the term is F.O.B. the place of shipment, the seller must at that place ship the goods in the manner provided by this Article (Section 2—504) and bear the expense and risk of putting them into the possession of the carrier; ***." (Ill. Ann. Stat., ch. 26, par. 2—319(1)(a) (Smith-Hurd 1963).)

Section 2—504 provides that the seller make reasonable delivery of the goods unless the sales contract specifies that the goods be delivered to a particular destination. (Ill. Ann. Stat., ch. 26, par. 2—504 (Smith-Hurd 1963).) Here, the goods were delivered to plaintiff's bookstores.

Although there is no dispute about the terms of sale, the parties disagree about what the term "F.O.B." includes. The evidence at trial showed that the charges added by Follett were these : (1) "4th class," which is the rate that the Postal Service charges; (2) "TRANS" is the transportation charge, which was an estimate of the cost of the shipping carton and the paper filler, plus the cost of shipping; and (3) "INS" is the "insurance" charge, a flat 20 cent charge that was added to each shipment. The record discloses, however, that Follett did not have any insurance policy; it replaced any books that were damaged or missing whenever a customer complained, which was general industry practice. In effect, Follett was a self-insurer.

The issue, then, is: does general industry practice mean that the term "F.O.B." includes all of these charges, or were the charges something extra that materially altered the contract. The case is governed by section 2—207 of the Uniform Commercial Code, which reads in part:

> "Sec. 2—207. Additional Terms in Acceptance or Confirmation
>
> (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless ac-

ceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) the offer expressly limits acceptance to the terms of the offer;

(b) they materially alter it; ***." (Ill. Ann. Stat., ch. 26, par. 2—207 (Smith-Hurd 1963).)

According to the official comments, "In many cases, as where the goods are shipped, accepted and paid for before any dispute arises, there is no question whether a contract has been made. In such cases, where the writings of the parties do not establish a contract, it is not necessary to determine which act or document constituted the offer and which the acceptance. [Citation.] The only question is what terms are included in the contract, and subsection (3) furnishes the governing rule." (Ill. Ann. Stat., ch. 26, par. 2—207, Uniform Commercial Code Comment 7, at 57 (Smith-Hurd 1985 Supp.).) Subsection (3) states:

"(3) conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act." Ill. Ann. Stat., ch. 26, par. 2—207(3) (Smith-Hurd 1963).

■ In this case, the charges under the term "BKPST TRANS-INS" were incorporated into the contract. Barliant paid a total of 24 invoices without objection during the period between January 1971 and May 1972. The record shows that Barliant's bookkeeper would examine the invoices and prepare the checks, and then Barliant himself would review the invoices before signing the checks. While it is true that Barliant received hundreds of invoices each month, the trial court did not err in imputing knowledge of the invoice charges to plaintiff. Under the Uniform Commercial Code, one has notice of a fact when "from all the facts and circumstances known to him at the time in question he has reason to know that it exists." (Ill. Ann. Stat., ch. 26, par. 1—201(25)(c) (Smith-Hurd 1963).) Here, the court found that Barliant's claim that he had no recollection of ever seeing the notation "BKPST TRANS-INS" was "incredible, because he testified that 'as a matter of general management' he examined packing slips

and invoices before making payment." The evidence supports the court's finding, which we will not disturb, for "[i]n a nonjury trial where there is conflicting testimony, the determination of the witnesses' credibility is for the trier of facts. The trial court's findings will not be disturbed unless they are manifestly against the weight of the evidence." *In re Marriage of Smith* (1980), 90 Ill. App. 3d 168, 174, 412 N.E.2d 985, *aff'd in part, rev'd in part* (1981), 86 Ill. 2d 518, 427 N.E.2d 1239.

Moreover, we have held that whether additional terms are to be considered a material alteration is "dependent upon whether the addition constitutes an unreasonable surprise to one of the bargaining parties." (*Clifford-Jacobs Forging Co. v. Capital Engineering & Manufacturing Co.* (1982), 107 Ill. App. 3d 29, 33, 437 N.E.2d 22, *appeal denied* (1982), 91 Ill. 2d 568.) Here, the evidence supports the finding that there was no unfair surprise because the additional charges were clearly marked on the invoices, and Barliant paid those invoices in full on 24 consecutive occasions over an 18-month period.

Examples of a clause that would materially alter a contract are one that negates an implied warranty that usually accompanies a product or one that requires that a complaint be made in a time that is materially shorter than customary or reasonable. (Ill. Ann. Stat., ch. 26, par. 2—207, Uniform Commercial Code Comment 4, at 153 (Smith-Hurd 1963).) For example, we have held that an invoice sent by a seller, which disclaimed a warranty that appeared as part of the alleged contract sent by the buyer, did not become part of the contract. (*Album Graphics, Inc. v. Beatrice Foods Co.* (1980), 87 Ill. App. 3d 338, 408 N.E.2d 1041.) Unlike that case, here we have a dispute about the cost of transporting goods, which does not go to the condition or the value of the goods themselves.

▪ The court properly found that Barliant did not prove his allegation that Follett's transportation and insurance charges were contrary to industry custom. The court found that:

> "*** the only expert testimony concerning custom and usage in the publishing industry was introduced by the plaintiff as part of his case through Mr. Follett, who has been in the publishing business since 1953. *** Mr. Follett testified that the INS or insurance charge was an accepted trade custom in the industry and that there was nothing unusual about it."

Course of dealing and usage of trade is covered by the Uniform Commercial Code in section 1—205, which reads:

> "Sec. 1—205. Course of Dealing and Usage of Trade
>
> (1) A course of dealing is a sequence of previous conduct be-

tween parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

(2) A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts. If it is established that such a usage is embodied in a written trade code or similar writing the interpretation of the writing is for the court." (Ill. Ann. Stat., ch. 26, par. 1—205 (Smith-Hurd 1963).)

Section 1—205 provides further that both course of dealing and usage of trade of which the parties are or should be aware supplement the terms of an agreement and they should be construed consistently with each other. (Ill. Ann. Stat., ch. 26, pars. 1—205(3), (4) (Smith-Hurd 1963).) Course of dealing, however, controls usage of trade. (Ill. Ann. Stat., ch. 26, par. 1—205(4) (Smith-Hurd 1963).) As we have seen, the course of dealing between the parties was that Follett billed Barliant for transportation and insurance and that Barliant paid. Thus, even if the usage of trade was what Barliant alleged, the course of dealings between plaintiff and defendant superceded any industry custom.

Moreover, Barliant did not prove by a preponderance of the evidence that the usage of trade was what he alleged: that F.O.B. did not include transportation and insurance charges. The evidence showed that Follett's cash customers were instructed to add 10% to their order to cover the costs of postage and handling. In addition, invoices of other publishers showed that they also added similar charges. For example, Harper & Row used the abbreviation "trans-ins," and Prentice-Hall's invoices were marked "insurance" and "carriage." Barliant admitted under cross-examination that he could not recall whether he had ever complained about the alleged overcharges, yet all of the invoices were paid. He also testified that all books were shipped to him by bookpost, but his testimony was contradicted by some purchase orders that specified that books be sent "pp or best," meaning that Follett had the option of sending books by United Parcel Service if the books were to be received as soon as possible. In sum, the evidence supports the trial court's ruling that Follett did not breach its contract.

■ Plaintiff Barliant also alleged that Follett breached the Uniform Deceptive Trade Practices Act. (Ill. Ann. Stat., ch. 121½, par. 311 *et seq.* (Smith-Hurd 1985 Supp.).) The purpose of the Act is to stem unfair competition, and the deceptive trade practices singled out

can be classed roughly into either misleading trade identification or false and deceptive advertising. Ill. Ann. Stat., ch. 121½, par. 311 *et seq.*, Prefatory Note of National Conference of Commissioners on Uniform State Laws, at 169 (Smith-Hurd 1985 Supp.).

Section 312 of the Uniform Act (Ill. Ann. Stat., ch. 121½, par. 312 (Smith-Hurd 1985 Supp.)) lists acts that constitute deceptive trade practices, but none of the acts resemble Follett's actions. The trial court found that Follett did not breach the contract with plaintiff; therefore, it naturally would follow that Follett did not engage in any deceptive practice.

The parties have also briefed before this court some aspects of the issue of damages. Because the trial was only on the issue of liability, however, we need not address the issue other than to conclude that the court's findings were supported by the evidence.

In conclusion, the evidence supports the trial court's findings that defendant did not breach its contract or commit fraud. We hold, therefore, that the court's findings were not against the manifest weight of the evidence.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

STAMOS, P.J., and PERLIN, J., concur.