**TRANS–AIRE INTERNATIONAL, INC., Plaintiff–Appellant,**

v.

**NORTHERN ADHESIVE COMPANY, INC., Defendant–Appellee.**

No. 88–1325.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 10, 1988.

Decided Aug. 21, 1989.

Michael J. Howlett, Jr., Ruberry, Phares, Abramson & Fox, Mark K. Rochford, Dean A. Dickie, Phelan, Pope & John, Chicago, Ill., for plaintiff-appellant.

Henry N. Novoselsky, Shaheen, Lundberg, Callahan & Orr, John T. Lynch, Joseph R. Steiger, Gregory S. Gann, Crooks, & Gilligan, Chicago, Ill., for defendant-appellee.

Before COFFEY, RIPPLE, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Trans–Aire International, Inc. purchased a contact adhesive from Northern Adhesive Company, Inc. to laminate various materials during the process of converting standard automotive vans to recreational vehicles. The adhesive failed to perform during the summer months as Trans–Aire had hoped, and it sued Northern under a wide variety of legal theories. The district court entered summary judgment in favor of Northern, and Trans–Aire appeals. We affirm.

## I. BACKGROUND

Trans–Aire International, Inc. converts ordinary automotive vans into recreational vehicles. Prior to October of 1982, Trans–Aire installed interior carpet and ceiling fabrics with an adhesive product, "3M 4500," manufactured by 3M Company. However, Trans–Aire experienced problems with that adhesive. Apparently, when the temperature rose inside a van, the adhesive often would fail to hold the fabrics in place.

Trans–Aire contacted Northern Adhesive Company, Inc., a manufacturer of a wide range of adhesive products, to find a replacement for the 3M product. Trans–Aire never requested a specific adhesive by name and instead merely informed Northern of the purposes for which Trans–Aire needed an adhesive. In response, Northern sent several adhesive samples to Trans–Aire for experimentation purposes. Allegedly, Northern told Trans–Aire that one of their adhesives, Adhesive 7448, was a "match" for the 3M product which had failed previously.

Trans–Aire tested the sample adhesives by putting them into its application equipment and applying them in the same manner in which Trans–Aire had been applying the 3M adhesive. The tests were conducted in a cool plant, rather than under the warmer weather conditions which had caused the 3M product to fail. Nevertheless, Trans–Aire's chief engineer, Stephen Fribley, determined that Northern's Adhesive 7448 was better than the 3M product.

Fribley summarized the results of the various test applications to Robert Higgins, Trans–Aire's president. Fribley suggested to Higgins that they test Northern's adhesive under summer-like conditions. However, Higgins stated that he was satisfied that Adhesive 7448 was better than the 3M product.

When Higgins asked, Fribley told Higgins that to his knowledge Adhesive 7448 had no warranty. A Northern representative confirmed Fribley's belief, stating that "there was no warranty on [Adhesive 7448] other than that—what they would ship would be like the sample. It would be the same chemistry." Fribley informed Higgins of this conversation.

Between November of 1982 and May of 1983, Trans–Aire ordered several shipments of Adhesive 7448. Trans–Aire placed each order by telephone and subsequently confirmed its request by sending a written purchase order.

Trans–Aire began to use Adhesive 7448 in late 1982 after placing its initial order. Beginning sometime in the spring of 1983, Trans–Aire learned of numerous delamination problems in the interiors of the RVs in which Adhesive 7448 had been used—the same problems experienced previously with the 3M product. As a result, Trans–Aire was forced to repair well over 500 vans.

Trans–Aire filed a nine-count complaint against Northern. The district court initially dismissed portions of the complaint and later granted Northern's motion for summary judgment upon the remaining claims.

## II. DISCUSSION

Trans–Aire appeals the district court's decision to grant Northern's motion for summary judgment upon Trans–Aire's vari-

ous breach of warranty and contract claims. At oral argument, counsel for Trans–Aire admitted that no material factual dispute exists and asserted that Trans–Aire instead intended to challenge the district court's legal conclusions. Nevertheless, counsel also stated that Trans–Aire disputed the inferences to be drawn from the established facts. Apparently, counsel was commenting upon Trans–Aire's briefs in which it devotes substantial time to insuring that we are aware that Northern's summary judgment motion largely was based upon the deposition of Trans–Aire's *former* employee and chief engineer, Stephen Fribley.

Trans–Aire evidently hopes to convey the impression that perhaps Fribley's testimony is not credible. However, we have held in the past that "[a] motion for summary judgment cannot be defeated merely by an opposing party's incantation of lack of credibility over a movant's supporting affidavit...." *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir.1988). Thus, because counsel admitted that it cannot offer any evidence which conflicts with that offered in support of Northern's motion for summary judgment, we will focus solely upon Trans–Aire's ability to demonstrate that the district court's legal conclusions are erroneous.

**1.** Even though Illinois has amended the Illinois Commercial Code and now refers to each provision as a "paragraph" rather than as a "section," as found in the current version of the Smith–Hurd Illinois Annotated Statutes (1963), we will continue to refer to the relevant provisions as sections to facilitate ease of research and to maintain consistency with the Uniform Commercial Code.

**2.** Section 2–314 states:
(1) Unless excluded or modified (Section 2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind....
(2) Goods to be merchantable must be at least such as
....
(c) are fit for the ordinary purposes for which such goods are used; ....
Ill.Ann.Stat. ch. 26, para. 2–314 (Smith–Hurd 1963).

## A. *Implied Warranties of Fitness for a Particular Purpose and of Merchantability*

Section 2–314 of the Illinois Commercial Code [1] provides that every sale of goods by a merchant includes an implied warranty that the goods are fit for the ordinary purposes for which they are used unless the warranty is modified or excluded.[2] Section 2–315 of the code states that a sale of goods also includes an implied warranty of fitness for a particular purpose if a seller knows of the buyer's particular purpose for the goods and the buyer relies upon the seller's skill or judgment to select suitable goods.[3] However, section 2–316 of the code states that no implied warranties apply when a buyer examines the goods or a sample as fully as he desires, or refuses to examine the goods, prior to the purchase.[4]

The district court first held that no warranty of fitness for a particular purpose arose under the facts and circumstances of this case because Trans–Aire did not rely upon Northern's skill or judgment to select an adhesive. Nevertheless, the court also held that even if such a warranty existed, it and any implied warranty of merchantability were excluded or waived under section 2–316, as a matter of law, when Trans–Aire examined Adhesive 7448 "as fully as it desired" prior to placing its purchase orders. Trans–Aire challenges the court's

**3.** Section 2–315 provides:
Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.
Ill.Ann.Stat. ch. 26, para. 2–315 (Smith–Hurd 1963).

**4.** Section 2–316(3)(b) states that:
When the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him....
Ill.Ann.Stat. ch. 26, para. 2–316(3)(b) (Smith–Hurd 1963 & Supp.1989).

legal conclusions under section 2–316 as well as the court's holding that no implied warranty of fitness for a particular purpose arose.

■ Initially, we hold that the district court correctly concluded that no warranty of fitness for a particular purpose existed. We agree with the district court that Trans–Aire cannot demonstrate that it relied upon Northern's skill or judgment in deciding to purchase Adhesive 7448, even assuming that Northern knew of the purpose for which Trans–Aire needed the adhesive.

Trans–Aire's chief engineer, Fribley, expressly stated in a deposition that he did not rely upon Northern's skill or judgment when Trans–Aire decided to purchase Adhesive 7448. Trans–Aire asserts that Fribley was not authorized to and did not negotiate the purchase of Adhesive 7448 and therefore his testimony is not dispositive of the issue whether Trans–Aire relied upon Northern's judgment. However, Trans–Aire's president, Higgins, clearly did make the final purchase decision and the record supports Northern's assertion that Higgins relied upon Fribley's recommendation. Furthermore, it is undisputed that Fribley's recommendation and Higgins' final decision were based upon the tests which Fribley conducted, not any express or implied representations made by Northern.[5] We therefore must agree with the district court that Trans–Aire cannot demonstrate that an implied warranty of fitness for a particular purpose existed.

■ However, we need not dwell upon this issue because we agree with the district court that Trans–Aire excluded all implied warranties by its actions. Under sec-

tion 2–316 of the Illinois Commercial Code, implied warranties are excluded when a party examines a product or sample "as fully as it desires" or "refuses to examine" the product or sample in a reasonable manner given the circumstances of the case. The undisputed facts and circumstances of this case preclude Trans–Aire's attempts to maintain an action based upon breaches of any existing implied warranties of fitness for a particular purpose or of merchantability.

As we indicated earlier, Northern offered the deposition testimony of Trans–Aire's former chief engineer, Fribley, to support its defense that Trans–Aire in fact tested samples of Adhesive 7448 "as fully as it desired." Fribley's undisputed testimony establishes that while he was Trans–Aire's chief engineer, Trans–Aire experienced problems with a 3M adhesive which it was using in its van conversion process and that he had contacted Northern to find a replacement. Northern sent a sample of Adhesive 7448 to Trans–Aire which Fribley tested in the usual laminating equipment. However, rather than testing the adhesive under summer-like conditions, the same conditions under which the 3M product had failed, Fribley stated that he performed the tests under "cool" conditions in the plant. He found the adhesive to be satisfactory under these conditions and reported the results to Trans–Aire's president, Higgins.

Fribley apparently realized that the cool conditions were inadequate to test the adhesive's performance characteristics during warmer weather. According to his undisputed testimony, he suggested to Higgins that the adhesive undergo heat testing because he knew that the inherent nature of contact adhesives is to soften with heat.[6]

---

**5.** The purchase of Adhesive 7448 began when Trans–Aire stated to Northern that it was experiencing problems with the 3M product which it currently was using in its van conversion process. In response, Northern supplied Trans–Aire with several different adhesive samples and "suggested that [Adhesive 7448] was the best they felt they had to offer...." Trans–Aire offers no evidence to support its contention that its ultimate decision to purchase Adhesive 7448 was based upon Northern's submission of particular test samples rather than upon the results

of the tests which Fribley performed and reported to Higgins.

**6.** Fribley's deposition testimony states:

I suggested that the application that we were putting it in, that a lot of times vehicles in the south and southwest, in the summertime, Arizona, Florida, some places such as that, that when they get closed up, it gets very hot in there, particularly like dark vehicles, that— and it's—in the nature of contacted (sic)—contact adhesives that they're—they will also soft-

Nevertheless, Trans–Aire's president believed that "the testing we had done proved the product satisfactory for our application."

Upon these facts, we must agree with the district court's finding that Trans–Aire clearly tested the samples as fully as it desired and refused to conduct further tests which would have confirmed a characteristic of contact adhesives which they already knew to be true, that they soften with heat. Trans–Aire attempts to argue that it did not have the means to discover the "latent defects" of the adhesive, because of the cool plant conditions at the time the tests were performed, and that section 2–316 does not exclude the implied warranties under these circumstances. *See* Ill.Ann.Stat. ch. 26, para. 2–316 Comment 8 (Smith–Hurd 1963 & Supp.1989) ("an examination under circumstances which do not permit chemical or other testing of the goods would not exclude defects which could be ascertained only by such testing"). We agree with the district court that this argument is without merit.

As Judge Williams noted, the portion of Fribley's deposition which discusses the conditions under which the tests were performed states nothing directly regarding the feasibility of heat testing. Instead, Fribley merely discussed the difficulty of applying the adhesive at a cold temperature and stated that the plant's temperature could not be adjusted "to meet different factors." No evidence exists to indicate what factors he meant. Trans–Aire itself offered no evidence of its own which indicates why the tests could not be performed.[7] The only concrete evidence of record as to why the heat tests were not performed is that Trans–Aire's president did not feel that they were necessary. Thus, the feasibility of the testing actually cannot be found to be in issue.

"A professional buyer examining a product in his field will be held to have assumed the risk as to all defects which a professional in the field ought to observe." Ill. Ann.Stat. ch. 26, para. 2–316 Comment 8 (Smith–Hurd 1963 & Supp.1988); *see also Blockhead, Inc. v. Plastic Forming Co.,* 402 F.Supp. 1017, 1025 (D.Conn.1975) ("The scope of the exclusion obtained through a buyer's examination depends not only on the examination made, but on the examination that should have been made by the particular buyer"). Trans–Aire clearly knew that contact adhesives generally soften with heat; in addition to Fribley's general observations, it is undisputed that Trans–Aire had experienced problems with another adhesive which it admits (and even argues in its favor) was a "match" for Adhesive 7448. We may only conclude that Trans–Aire's actions and statements evidence a clear intent to waive any reliance upon the implied warranties. We therefore hold that Trans–Aire cannot now maintain claims for breach of any existing implied warranties of fitness for a particular purpose or of merchantability and that summary judgment was appropriate.

**B. *Express Warranty***

Trans–Aire next argues that the district court erroneously concluded that an express warranty was not created in this case. Trans–Aire contends that by sending specific adhesive samples to Trans–Aire in response to a general statement of need to find a new adhesive for the inadequate 3M product Northern expressly warranted that those samples would meet Trans–Aire's production needs. Trans–Aire apparently did not make this specific argument below, but it certainly would not have fared any better than it does here.

The record indicates that Trans–Aire requested product information from Northern and stated that it wished to purchase a

en with heat, and I didn't know what temperature that would occur.

**7.** Northern suggests that Trans–Aire could have tested the adhesive's effectiveness under warm weather conditions by placing electric heaters inside of a van, by testing a small sample of the applied adhesive in a conventional oven, or by

sending samples out to an independent laboratory for testing. The ease with which at least the two former tests could have been conducted appears to undercut Trans–Aire's assertions that testing sufficient to establish the characteristics which Fribley already suspected was impossible or at least highly impractical.

"suitable" product. According to Fribley's undisputed testimony, a Northern representative did not state that any of its adhesives were "suitable" for Trans–Aire's purposes and instead merely commented that Northern manufactured various adhesives, one or more of which "might be applicable." At best (or perhaps worst), Northern stated that its Adhesive 7448 product was a "match" for the 3M product with which Trans–Aire had experienced lamination failures in warmer settings. Thereafter, Northern sent several adhesive samples to Trans–Aire for testing purposes in hopes that Trans–Aire would find an adhesive which it could use. With these facts, Trans–Aire cannot now claim that Northern provided a specific product in response to its needs which amounted to an "affirmation of fact" that the adhesive would meet Trans–Aire's manufacturing needs. See Ill.Ann.Stat. ch. 26, para. 2–313(1)(a) (Smith–Hurd 1963).

As for Trans–Aire's remaining arguments, we need only reiterate the points made by the district court. Without any doubt whatsoever, Trans–Aire knew that Adhesive 7448 included no express warranties. Fribley told Trans–Aire's president, Higgins, that he "didn't know of any adhesive that had a warranty on it due to the many variables of temperature and materials and application methods." More importantly, Northern confirmed Fribley's belief when it stated "that there was no warranty on [Adhesive 7448] other than that—what they would ship would be like the sample. It would be the same chemistry." Fribley relayed this information directly to Higgins. We therefore hold that the district court correctly granted summary judgment in favor of Northern on the express warranty count.

## C. Breach of Purchase Order Contract

Finally, Trans–Aire argues that the district court improperly granted summary

judgment in favor of Northern on the breach of purchase order contract claim. In its complaint, Trans–Aire alleged that it confirmed each of twelve separate telephone orders for Adhesive 7448 by mailing a purchase order to Northern. Each purchase order provided that Northern would "protect, defend or save harmless" Trans–Aire from all damages and claims for liability for property damage resulting from the sale or use of Adhesive 7448.[8] The district court found that the additional terms contained in the written purchase orders "materially altered" the parties' agreement and could not be considered part of the contract. Trans–Aire challenges the validity of this legal conclusion.

The parties do not challenge the district court's reliance upon our earlier statements that "once the existence and terms of an alleged oral agreement have been established, it is necessary to refer to Section 2–207 ... to ascertain whether a term in a written confirmation but not in the parties' oral agreement is binding on the recipient of the written confirmation." C. Itoh & Co. (Am.) v. Jordan Int'l Co., 552 F.2d 1228, 1233 (7th Cir.1977). Instead, they argue over the district court's interpretation of the indemnification clause under that section.

■ Section 2–207 of the Illinois Commercial Code provides that additional terms included in a written confirmation "are to be construed as proposals for addition to the contract" and will not become part of the contract if "they materially alter it." See Ill.Ann.Stat. ch. 26, para. 2–207(2) (Smith–Hurd 1963); McCarty v. Verson Allsteel Press Co., 89 Ill.App.3d 498, 411 N.E.2d 936, 44 Ill.Dec. 570 (1980). A term is considered to be a material alteration if its inclusion would "result in surprise or hardship if incorporated without express awareness by the other party." Ill.Ann.

8. The indemnity clause provides in part:
By accepting this order, [Northern] agrees to defend, protect, and save harmless [Trans–Aire] and its vendees from all damages, claims and costs, including attorney fees, arising out of ... (2) liability for personal injuries, death or sickness or damages to personal property which may be sustained by or claimed by person or persons in connection with the sale or use of the products hereby purchased, based upon improper or negligent manufacturing thereof or defects in the design thereof.

Stat. ch. 26, para. 2–207 Comment 4 (Smith–Hurd 1963); *Clifford–Jacobs Forging Co. v. Capital Eng'g & Mfg. Co.*, 107 Ill.App.3d 29, 32, 437 N.E.2d 22, 24, 62 Ill.Dec. 785, 787 (1982); *see also Chicago Litho Plate Graining Co. v. Allstate Can Co.*, 838 F.2d 927, 931 (7th Cir.1988). Generally, whether an additional term "materially alters" a contract should not be determined upon a summary judgment motion because the inquiry is merely part of a process to ascertain the parties' bargaining intent. *Clifford–Jacobs Forging Co.*, 107 Ill.App.3d at 33, 437 N.E.2d at 25, 62 Ill. Dec. at 788. However, summary judgment may be appropriate when the parties cannot honestly dispute that a term would result in surprise or undue hardship unless both parties agree to its inclusion. *Id.; see also* Ill.Ann.Stat. ch. 26, para. 2–207 Comment 4 (Smith–Hurd 1963).

The district court found that, as a matter of law, an indemnification clause constitutes a material alteration of the parties' agreement. Trans–Aire contests this conclusion, noting that between November, 1982 and May, 1983 it sent purchase orders containing the indemnification clause to Northern on twelve different occasions. On these facts, it contends that inclusion of the term, although not expressly agreed upon, could not have been a "surprise" to Northern. Relying upon our decision in *Schulze & Burch Biscuit Co. v. Tree Top, Inc.*, 831 F.2d 709 (7th Cir.1987), Trans-Aire concludes that the indemnification clause cannot be characterized as a material alteration.

In *Schulze*, we considered a nonassenting party's claim that an arbitration clause in a preprinted confirmation form should be deemed a material alteration of the parties' agreement and thus unenforceable without both parties' assent. There, the party sending the confirmation form and seeking to enforce the arbitration clause offered evidence which showed that it had sent nine of these forms over an unspecified period of time before sending an identical form containing the identical clause which it now sought to enforce. *Id.* at 715. We

stated that this "course of dealing" between the parties, *see* Ill.Ann.Stat. ch. 26, para. 1–205 (Smith–Hurd 1963), foreclosed any claim of "unfair surprise" by the party seeking to avoid enforcement of the arbitration clause. We therefore held that the clause could not be characterized as a material alteration of the parties' agreement. *Id.* We noted that the party which received each of these forms needed only to object to the arbitration clause within a reasonable amount of time under section 2–207(2)(c) if it wished to exclude the term from the governing agreement. Ill.Ann. Stat. ch. 26, para. 2–207(2)(c) (Smith–Hurd 1963).

We agree with Trans–Aire that at first blush our decision in *Schulze* appears to support its contention that a "course of dealing" existed between Trans–Aire and Northern which arguably would preclude a finding that inclusion of the indemnification clause constitutes a material alteration of the parties' agreement. Nevertheless, we believe that we are presented with a different situation than we faced in *Schulze*.

As we stated above, Comment 4 to section 2–207 defines a material alteration as one which would "result in surprise *or hardship* if incorporated without the express awareness" of the nonassenting party. Ill.Ann.Stat. ch. 26, para. 2–207 Comment 4 (Smith–Hurd 1963) (emphasis added); *see Maxon Corp. v. Tyler Pipe Indus.*, 497 N.E.2d 570, 576 (Ind.App.1986) (an Indiana court interpreting the identical section of the Uniform Commercial Code and considering a similar indemnification clause); *Dohm & Nelke v. Wilson Foods Corp.*, 531 N.E.2d 512, 514 (Ind.App.1988) (agreeing with *Maxon* that indemnification clauses require the express consent of both parties). Under this language, an additional term may be characterized as a material alteration if it either "surprises" the nonassenting party or if its inclusion, without an express meeting of the minds, would impose an unreasonable "hardship" upon the nonassenting party. With this overlooked distinction made, we believe that *Schulze*, as well as *Barliant v. Follett Corp.*, 138

Ill.App.3d 756, 483 N.E.2d 1312, 1316, 91 Ill.Dec. 677, 681 (1985), the other decision which Trans–Aire relies upon at length, are distinguishable.

In *Schulze* and *Barliant*, the additional term in issue could not be characterized as imposing a significant hardship upon the nonassenting party. In *Schulze*, we considered an arbitration clause which stated that all disputes arising out of a sale would be "arbitrated in the usual manner." 831 F.2d at 711. No Illinois court had considered the issue whether such a term was a material alteration *per se*. *Id.* at 713–14. However, it is clear that the term would impose no substantial hardship upon the nonassenting party. True, the term deprived the party of certain rights. However, for all practical purposes, the term had little effect upon the nonassenting party's economic welfare. That is, the nonassenting party still had an opportunity to prosecute or defend its interests albeit in a different forum. We thus did not discuss the hardship aspect of the term and focused solely upon whether the additional term resulted in surprise to the nonassenting party, ultimately finding that the parties' course of dealing precluded any claim of surprise.

Similarly, in *Barliant*, 483 N.E.2d at 1314–15, 91 Ill.Dec. at 681–82, the court recognized at the outset that a term dealing with the costs of transporting certain goods was not unreasonable in itself because of the recognized industry custom. Thus, that court likewise focused solely

upon the surprise, or lack thereof, to the nonassenting party and determined that the nonassenting party had implicitly accepted the term through an established course of dealing and the existing usage of trade. As a result, both *Schulze* and *Barliant* turned almost exclusively, if not entirely, upon the element of surprise.

■ We are not convinced that the additional indemnification term should not be characterized as a material alteration of the parties' agreement even if we focus solely upon the element of surprise.[9] However, the indemnification clause clearly imposes an unreasonable hardship upon Northern which should not be enforced without evidence of mutual assent to that term.

Admittedly, we face a situation where the Illinois courts apparently have not addressed the issue whether an indemnification clause is a material alteration *per se*, although at least one court in Illinois has suggested that an indemnification clause might be unreasonable. *See McCarty*, 89 Ill.App.3d 498, 44 Ill.Dec. 570, 411 N.E.2d 936. Nevertheless, under the facts and circumstances of this case, it is unmistakable that the additional term must be deemed a material alteration of the parties' agreement.

Unlike the enforcement of the arbitration clause in *Schulze* or the transportation clause in *Barliant*, we create the very real possibility that Northern will incur substantial economic hardship, which it never

---

9. While it is significant that the parties exchanged twelve forms containing the identical clause, it is also noteworthy that all twelve transactions occurred in a span of approximately six months. Although the record is silent as to the temporal spacing of the orders, we must acknowledge the possibility that the orders were placed in such a manner that Northern had little opportunity to recognize that Trans–Aire wished to modify their earlier understanding. Thus, the number of forms exchanged in itself may be insufficient to establish a "course of dealing." Unfortunately, *Schulze* offers little guidance on this particular point. However, in *Barliant*, the court stressed that no "surprise" occurred because the non-assenting party received "clearly marked" invoices which it paid "in full on 24 consecutive occasions over an 18–month period."

Furthermore, a course of dealing analysis is not as easily performed here as in *Schulze*. As discussed above, in *Schulze* a party attempted to enforce an arbitration clause following the delivery of unsatisfactory goods. In each of nine separate prior purchases, the goods had been satisfactory. In contrast, Trans–Aire here apparently seeks to impose liability for damages resulting from its use of adhesive received following the very first order as well as from adhesive received following its twelfth order. On these facts, it is more difficult to find that a course of dealing existed to justify enforcing the indemnification clause for the early purchases, even if we were to assume that Trans–Aire could demonstrate that such a course developed later. Fortunately, we need not decide this issue definitively for purposes of resolving this appeal.

expressly contemplated, if we enforce the indemnification clause in issue. The indemnification clause has the same effect as a provision which disclaims or excludes various warranties ordinarily included in the sale of goods. The latter is regularly characterized as a material alteration as a matter of law, *see* Ill.Ann.Stat. ch. 26, para. 2–207 Comment 4 (Smith–Hurd 1963); *see also Album Graphics, Inc. v. Beatrice Foods Co.*, 87 Ill.App.3d 338, 347, 408 N.E.2d 1041, 1048, 42 Ill.Dec. 332, 339 (1980), and we see no reason why an indemnification clause should not be characterized likewise. *See, e.g., Maxon*, 497 N.E.2d at 575–80.

■ An indemnification clause, like a warranty disclaimer, relieves a party of otherwise well-established legal duties and obligations. Clearly, a shift in legal liability which has the effect of relieving one party of the potential for significant economic hardship and placing this burden upon another party is an important term in any contract. Thus, it is not surprising that such a term, if it is to be included in a contract, is ordinarily the subject of active negotiation between parties. We therefore do not believe that a party charged with legal duties and obligations may reasonably rely upon a boilerplate clause in a boilerplate form and a corresponding operation of law to shift substantial economic burdens from itself to a nonassenting party when it had every opportunity to negotiate such a term if it desired.

By including the indemnification clause in very small print on the back of a preprinted form, Trans–Aire in effect sought a guarantee, or warranty, that the adhesive would serve its production needs even though Northern affirmatively stated that the sale included no express warranties and actively encouraged Trans–Aire to test various samples prior to purchase to determine their usefulness, thereby negating any implied warranties. Furthermore, Trans–Aire attempted to include this term as part of the parties' bargain, without Northern's assent, even though Trans–Aire knew that some significant possibility existed that the adhesive would fail under warm weather conditions just like its functional equivalent had done. Under these circumstances, we do not believe that Trans–Aire can prevail. We therefore hold that the indemnification clause constituted a material alteration of the parties' original agreement and did not become a part of that agreement.

### III. CONCLUSION

We hold that the district court correctly entered summary judgment in favor of Northern Adhesive Company, Inc. upon Trans–Aire International, Inc.'s claims for breaches of any existing implied and express warranties and for breach of contract. Trans–Aire wholly failed to offer evidence to contradict the evidence of record and the district court's legal conclusions are without error.

Trans–Aire waived any existing warranties of merchantability and of fitness for a particular purpose. Further, the record reveals that no express warranties existed. Finally, we hold that the purchase order indemnification clause materially altered the terms of the parties' agreement and failed to become a part of that contract.

The district court's decision is AFFIRMED.