ABATRON, INC., Plaintiff and Counterdefendant-Appellee, v. FULTON
CONTRACTING COMPANY, Defendant and Counterplaintiff-Appellant.

Second District   No. 2—88—0063

Opinion filed October 21, 1988.

John S. Biallas, of Batavia (Edgar P. Petti, of counsel), for appellant.

Marsha J. Caporaso, of Sleepy Hollow, for appellee.

JUSTICE WOODWARD delivered the opinion of the court:
Following a bench trial, the trial court entered an order granting judgment in the amount of $2,740.19 in favor of plaintiff and counter-defendant, Abatron, Inc., and against defendant and counterplaintiff, Fulton Contracting Co., and denying Fulton's counterclaim. Fulton appeals.

On appeal, Fulton raises the following issues: whether the trial court's finding that Fulton did not sustain its burden of proof as to the conforming epoxy materials is against the manifest weight of the evidence; whether the trial court erred in finding that the epoxy materials were irrevocably accepted by Fulton; whether the trial court erred in finding that Abatron did not breach its express and implied warranties made to Fulton; and whether Fulton is entitled to cancel the sale and recover its damages caused by plaintiff's tender of nonconforming goods. We affirm.

From the pleadings on file and the testimony at trial, the following facts were presented. Fulton is engaged in the electrical contracting business. It constructed a truck facility for servicing its trucks. A wash bay, approximately 40 feet by 15 feet, was constructed for the cleaning of Fulton's trucks and road equipment. When the construction of the wash bay was completed, Fulton found that the pitch in its concrete floor did not have sufficient fall or slope to permit normal water drainage into a drain trough which had been installed in the center of the floor. Frank Kehoe, vice-president of Fulton, instructed Jim Haberkost, the purchasing agent, to obtain appraisals of how to correct the problem.

Eventually, the decision was made to purchase an epoxy product sold under the trade name of Abocrete which was manufactured and sold by Abatron. Kehoe instructed Haberkost to obtain a sample of the Abocrete and further information on it. Fulton received two cans of epoxy materials from Abatron, one marked can A and the other can B. John Vlasnik, a shop foreman at Fulton, mixed the sample cans into a blend of epoxy with sand, using the formula one part epoxy to three parts of sand, i.e., a gallon and one-half of sand was mixed with one-half gallon of the epoxy blend. Vlasnik found that the product adhered well and had a hard finish. A decision was made to purchase the Abocrete product.

According to Jim Haberkost, he also talked to Marsha Caporaso,

the secretary/treasurer of Abatron, about the problem with the wash bay on more than one occasion prior to the delivery of the product to Fulton. He also discussed the situation with Beth Jones at Abatron. (At trial, it was revealed that "Beth Jones" was not a real person but a name used by Abatron for answering customer inquiries.) While Haberkost had some general knowledge of installation of epoxy materials, he relied on Marsha Caporaso's recommendation; he had been referred to her for technical assistance. Haberkost also received various brochures and instructions from Abatron concerning the product. Haberkost denied receiving materials concerning coating and resurfacing floors with Abatron epoxies.

Master Tile Company was hired by Fulton to install the Abocrete in Fulton's wash bay. On June 9, 1987, John McBean, the installer, opened the packages of Abocrete which had been delivered a few days before. The contents of the package consisted of cans labeled "Part A" and "Part B." Part A was a gallon container, and part B was a quart container. Part A bore a label giving the following information about the product.

### "SURFACE PREPARATION.

Abocrete offers superb adhesion on surfaces that are sound, clean and dry, especially if they are washed, sandblasted or scarified. Oil, grease, wax or old paint can prevent adhesion. They must be removed with detergents, solvents or strippers. Laitance (deceptively sound-looking surface of new concrete) must be removed with sandblasting or 10% muriatic acid treatment. After treating, the floor must be rinsed, dried and vacuumed. Thin cracks should be deepened and enlarged enough to facilitate filling with the epoxy grout.

### MIXING.

Remove the contents (sand and the 2 cans) from the 5-gallon pail. Empty the 2 cans (A and B) into the 5-gallon pail and mix the A and B liquids thoroughly with a stick, paddle or with a paint stirrer attached to a power drill. Then mix the sand in, about 1-3 minutes after mixing has started. Concrete powder or pigments can be added to obtain the desired color. Additional coarse sand, chips, gravel or pebbles can be added (as long as they are clean and dry) to increase the total volume up to 10 times. The A/B blend can also be spread with brush, squeegee or paint roller as a clear coating without sand.

Mix no more than can be used in 20-40 minutes. When only part of the kit is needed, pour the needed amount of A (resin) into a smaller container and mix it with the corresponding

amount of B (hardener) in the ratios indicated on the can label, add the desired amount of sand, and save the rest of the unblended kit in the 5-gallon pail for future use. When properly stored in the original containers, A and B will remain useable indefinitely or at least one year, whereas other resins have a short shelf life.

**APPLICATION.**

If the A/B blend is used without sand, it can be poured, spread, brushed or sprayed. This way, it will harden into a transparent film or mass (in any thickness, even many inches) as hard as concrete and as smooth as glass. Often this method is used to build a thin film which is then made antislip by broadcasting the ABOCRETE sand onto it until it covers the resin completely. A few hours later, when the resin is hard, the excess sand can be swept away, and the resulting surface is smooth and antislip. This is common practice on stairs, industrial floors, loading docks, inclined surfaces and countless other places.

**The A/B blend with sand and/or aggregate** is ideal for: (1) filling cracks, holes, pitted and spalled areas, (2) rebuilding broken parts, entire missing sections or adding to the existing ones by simply pouring into forms or onto surfaces, such as broken steps, railings, sculptures, structural and decorative components, (3) filling cavities or covering surfaces for installing posts, structural elements of machinery, bonding precasts and other structures to floors and walls, (4) pouring and troweling new surfaces to withstand heavy traffic, abrasion, salt water, chemicals, oils and other agents that concrete alone could not resist. Unlike other repair materials, **ABOCRETE WELDS PERMANENTLY TO, AND LASTS LONGER THAN, THE SURROUNDING CONCRETE SURFACE.**"

Other than the labels on the cans, McBean found no other installation instructions in the package of Abocrete. However, according to McBean, prior to the installation date, he reviewed some literature about Abocrete, and he spoke with Marsha Caporaso and asked her whether a primer or bonding agent was needed for the floor. She informed him it was not needed. He also questioned the amount of sand needed for the mixture. Marsha assured him that the mixture could be 10 to 1, although to McBean, that sounded like a lot.

John Vlasnik was responsible for preparing the floor for the application of the Abocrete. He washed the concrete floor at the installation site by using a general purpose cleaning detergent with water.

After this, the same area was washed with a muriatic acid solution mixed 50% acid and 50% water. The area was then rinsed with a garden hose for approximately two hours and then squeegeed. The floor was left to dry. The drying was done in a heated room for a period of two or three days.

Regarding the mixing of the product, on direct examination, McBean testified for Fulton as follows:

"Q. And did you mix the Abocrete product that was there at Fulton Contracting?

A. Yes, I did.

Q. And will you please state how you mixed that material?

A. I mixed a Part A with a Part B, I let it slack or let it sit in the pot for approximately three minutes, let it sit there for three minutes after I mixed, and then we added seven parts of sand to that, then mixed that with that mixture after it sat.

Q. When you say seven parts of sand, you mean seven parts of sand in ratio to what?

A. Well, the mixture is a gallon, and we would mix seven gallons of sand with that mixture.

Q. Very well.

A. Gallon of product.

Q. Now, did you, in mixing, rely upon the information provided on the label?

A. Yes.

\* \* \*

Q. Was it your understanding at the time that you were following those instructions correctly?

A. Yes."

The installation was done over three days, commencing on June 9, 1986. After mixing the Abocrete, McBean began spreading the product over the floor of the wash bay. When he had finished about half of the job, he ran out of the Abocrete. Fulton obtained more of the product by the next day which McBean mixed the same as the first batch. Again, there was not enough to finish the job, so more of the product was obtained from Abatron. The product was mixed with the same ratio of sand as the first and second batches were and was applied in the same way.

According to Jim Haberkost, after the installation of the Abocrete, it was noticed that the floor was not getting hard, and as time progressed, the Abocrete was actually lifting from the floor with no adhesion or bonding to it at all. On June 14, 1986, Haberkost called John Caporaso, the president of Abatron and explained the difficulties

Fulton was having with the floor. Caporaso, who is a chemist, told him it was possible that the material may have reacted to moisture in the air causing it to be sticky and not as hard as it should be. Caporaso advised Haberkost to wait a few days, and it should get hard. At about the same time, Frank Kehoe contacted McBean, the installer, and informed him of the condition of the floor. McBean visited the site and found that the floor was not adhering to the concrete and was lifting off of the floor and had cracks.

Haberkost again contacted John Caporaso and told him that the Abocrete had still not developed into the hard product Fulton had expected. Caporaso again told him to wait a little bit longer for the product to harden. Kehoe then instructed Haberkost to have Caporaso come to the facility and view the problem.

After viewing the wash bay area, Caporaso was of the opinion that the product had been misapplied and not properly mixed, in that too much sand had been used, given the type of sand Fulton had chosen to use. Caporaso also concluded that the surface had not been prepared properly because the "laitance" had not been removed. "Laitance" refers to the flat, deceptively strong looking surface of new concrete which must be removed when concrete is coated because it is a source of dust and particles that remain sticking on the surface. According to Caporaso, he asked Haberkost if the laitance had been removed, and Haberkost replied in the negative. Caporaso also noted that the surface was not etched, which would have indicated the removal of the laitance. The label of can A requires that the laitance be removed with sandblasting or 10% muriatic acid treatment. In preparing the surface, Vlasnick had washed the surface with 50% muriatic acid and 50% water.

Caporaso explained that muriatic acid was a commercial name for hydrochloric acid. A 50/50 muriatic and water solution would never be used on concrete because it would produce soluble and insoluble chlorides that would interfere with any coating. Even with the 10% solution recommended on the label, the floor had to be washed and tested with litmus or pH paper to make sure the pH was not below seven. With a 50% solution, Caporaso felt no amount of water could eliminate all of the insoluble chlorides, and, thus, adhesion would be impossible.

Caporaso also observed the area where the Abocrete sample had been tested by Fulton. Although the product was the same, the mix was different in that it had used less sand and a different kind of sand.

Fulton's employees removed the Abocrete material from the wash

bay floor. McBean installed a new mixture consisting of portland cement and latex, which proved satisfactory. Thereafter Fulton refused to pay Abatron's invoices for the three shipments of Abocrete.

Abatron then brought suit to collect $2,740.19 owed on the three invoices. Fulton counterclaimed for the cost of applying and then removing the Abocrete. As previously stated, the trial court entered judgment for Abatron and denied Fulton's counterclaim. This appeal followed.

■ The issue controlling the outcome of this case is whether the trial court erred in finding that Fulton did not prove that the Abocrete product was nonconforming. Fulton maintains that the product was nonconforming and that, as a result, the case before us falls within the express warranties of section 2—313 of the Uniform Commercial Code (Code) (Ill. Rev. Stat. 1985, ch. 26, par. 2—313) and the implied warranties of section 2—314 of the Code (Ill. Rev. Stat. 1985, ch. 26, par. 2—314). While we agree with Fulton that if the product were nonconforming these statutory warranties would apply, we find under the circumstances in this case that the product was conforming.

Fulton maintains that although it is necessary to show a nonconformity, it is not necessary to prove specific defects by expert testimony. (*Burrus v. Itek Corp.* (1977), 46 Ill. App. 3d 350.) In the case at bar, Fulton argues that there was ample proof of the nonconforming or defectiveness of the Abocrete, pointing to the testimony at trial that the product never hardened, had no strength, and did not adhere to the concrete floor. Nevertheless, we disagree with Fulton that it proved the existence of a defective product. We note that Fulton's installer, John McBean, testified that he did not know why the Abocrete did not adhere. Yet, John Caporaso testified that the 50/50 muriatic acid-water solution Vlasnick testified he washed the floor of the wash bay with could not be completely rinsed off and would result in the product not adhering to the surface of the concrete.

*Burrus v. Itec Corp.*, which is relied on here by Fulton, is distinguishable from the case at bar. In *Burrus*, plaintiff, a job printer, purchased a printing press from the defendant. Representatives of the defendant installed the press. According to plaintiff, the press never worked properly; it did not feed properly, it failed to register properly, the machine streaked or smeared the printed surface, was slow in printing, and problems with loose or defective parts were always present. Defendant's representatives spent many hours trying to correct the deficiencies in the machine, and a salesman for defendant recommended to defendant that the machine be replaced. Defendant refused to do so, and plaintiff filed suit alleging a breach of the im-

plied warranty. Defendant took the position that the operators of the press were not skilled operators and that the press did not receive proper maintenance. The trial court found in plaintiff's favor and awarded damages for the breach. Defendant appealed.

On appeal, the defendant, citing no authority, argued that plaintiff was required to prove the specific defects in the press which caused the poor operation of the press and that this must be done by expert testimony. The reviewing court rejected this argument, pointing out that there was no mention of specific defects in the test of a breach of implied warranty of merchantability in section 2—314(2)(c) of the Code (Ill. Rev. Stat. 1975, ch. 26, par. 2—314(2)(c)).

Further, in the reviewing court's opinion, plaintiff had more than amply proved a breach of implied warranty by the defendant. First, there was evidence supporting plaintiff's contention that the press did not operate properly. Second, the defects in the press purchased by plaintiff were not present in other presses of the same type. Third, although defendant blamed the problem on improper maintenance, the problems were apparent immediately after delivery. Further, an expert witness testified that the press was at all times properly maintained. Finally, defendant acknowledged that one of the operators was an expert, yet he encountered the same problems as the other operator.

In the case before us, all parties appear to agree that the product adhered to the concrete as it was supposed to do. However, unlike in *Burrus*, where the court could reject defendant's arguments of improper maintenance and incompetent operations as reasons for the failure of the press to work, here, Vlasnik's testimony regarding his preparation of the surface in which he far exceeded the instructed amount of muriatic acid to be used, and Caporaso's testimony that the product would not adhere if the surface was prepared in that fashion, support the trial court's finding that the product was not defective and no breach of warranty occurred. In addition, although McBean testified that he mixed the concrete of the two cans with the sand properly, Caporaso testified that the area where the sample of Abocrete was tested and where it had adhered had a mix different from the mix used in the wash bay area where it had failed to adhere.

The defense of breach of implied warranty is an affirmative defense which must be pleaded and proved by a preponderance of the evidence by the party relying on it. (*Alco Standard Corp. v. F. & B. Manufacturing Co.* (1970), 132 Ill. App. 2d 24, *rev'd on other grounds* (1972), 51 Ill. 2d 186.) Merely showing that the product did not work under the circumstances of this case is not sufficient to prove that the

product was defective and/or nonconforming. It is well settled that the trial court is the judge of the credibility of the witnesses, and where the trial court is the trier of fact, its decision should not be overturned unless it is against the manifest weight of the evidence. We agree with the trial court that defendant failed to sustain its burden of proof and in fact did not prove that the product was nonconforming. Deciding the case as we do, we need not address the other issues raised by the defendant.

The judgment of the circuit court is affirmed.

Affirmed.

LINDBERG, P.J., and UNVERZAGT, J., concur.