**COMARK MERCHANDISING, INCORPORATED,**
Plaintiff–Appellant/Cross–Appellee,

v.

**HIGHLAND GROUP, INCORPORATED,**
Defendant–Appellee/Cross–Appellant.

**Nos. 90–1672, 90–1763.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 26, 1990.

Decided May 23, 1991.

James A. Flesch, Richard S. Davis, Rudnick & Wolfe, Chicago, Ill., for plaintiff-appellant/cross-appellee.

J. Timothy Cerney, Diana J. Faust, Edward J. McGillen, Carroll, Hartigan & McCauley, Chicago, Ill., for defendant-appellee/cross-appellant.

Before BAUER, Chief Judge, WOOD, Jr., and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

The plaintiff contracted with the defendant to produce two million recipe brochures for the defendant's pizza promotional project. The parties exchanged price quotations and a purchase order reflecting the agreement. The plaintiff's price quotations contained an additional terms provision requiring interest and attorney's fees in the event of late payment. A dispute arose concerning the amount due under the contract, and this litigation ensued. Following a bench trial, the district court ruled in favor of the plaintiff, but did not award attorney's fees. Both parties appealed. For the following reasons, we affirm the judgment of the district court.

## I

## BACKGROUND

### A. *Facts*

Boboli Co. (Boboli) produces thick "California style" pizza bread shells (pizza bread) for sale in supermarkets and for use in restaurants. Boboli decided to introduce its pizza bread into Southern California supermarkets. To promote this introduction, Boboli decided to insert folded brochures containing suggested recipes in the plastic package with the pizza bread. Given its limited promotional budget, Boboli decided not to overwrap each brochure in polypropylene plastic, a method of shielding the brochures from the oil and grease of the fresh pizza bread. In the summer of 1987, Boboli engaged the Highland Group, Inc. (Highland), a marketing and sales promotion agency, to design and produce the brochures.

Because the brochures would be in contact with food, federal law required that they be produced with non-toxic inks approved by the Food and Drug Administration (FDA inks). In November 1987, Sydney Griffin, Highland's production manager, discussed the printing of the brochures with several paper and ink suppliers, including Colorcon, Inc. (Colorcon), an FDA ink manufacturer. Griffin explained to Colorcon that the brochures would be placed on a pizza dough product. Colorcon replied that FDA inks may smear in such application and offered to test Colorcon's inks on the Boboli pizza bread. Neither Griffin nor any other Highland employee, however, accepted Colorcon's offer to test the FDA inks. Colorcon also recommended

Comark Merchandising, Inc. (Comark), as a quality printer of FDA ink materials.

Griffin approached Kenneth Kroslak, a Comark sales representative, to obtain a price quotation for printing the brochures. Griffin explained to Kroslak that the brochures were to be used in connection with a new pizza product, but refused, when Kroslak asked for additional details, to identify further the nature of the product, the conditions under which the brochures would be packaged with the product, or the name of the company producing the product. Griffin informed Kroslak that she had researched the brochure project carefully by discussing the project with ink and paper manufacturers, and was simply looking for a printer to produce a quality job satisfying her specifications. Kroslak replied that, because of the nature of FDA inks, Comark desired to know, prior to production, how materials printed with FDA inks will be used. He also indicated that overwrapping the materials often should be considered. Griffin again refused to provide further information. Sensing that he could lose Highland's business if he pressed the issue, Kroslak did not insist on additional information.

In several subsequent conversations, Kroslak provided Griffin with various price quotations for printing the brochures on different types and weights of paper. On November 23, 1987, Comark sent Griffin, at Kroslak's direction, a price quotation, on Comark's standard sales quotation form, for production of either two million or three million brochures on FDA-approved 100 pound coated text paper. Such paper, however, is unsuitable for direct contact with food because it is not water, oil, or grease resistant and thus tends to bleed or smear when it touches those substances. Thereafter, Kroslak and Griffin discussed quotes for printing the brochures on oil and grease resistant (OGR), or water, oil, and grease resistant (WOGR) paper. During these discussions, Kroslak remained uninformed as to the brochure's intended use. During this time, Griffin also requested

and received samples of Planters Popcorn coupons, which were printed by Comark on WOGR paper with FDA inks. Griffin and Highland's vice-chairman were pleased with the appearance and quality of the coupons and forwarded some of the coupons to Boboli. Boboli in turn placed several coupons in packages of its freshly baked pizza bread to determine whether the coupons would warp or absorb grease. Neither problem occurred.

In late December 1987, after further discussions, Kroslak and Griffin agreed that the brochures would be printed on fifty pound WOGR paper. On December 23, 1987, at Kroslak's direction, Comark sent Griffin a second price quotation listing those specifications and a $61,420 base price for production of two million brochures. Both this quotation and the prior November 23, 1987 quotation from Comark to Highland simply listed the job as a "recipe brochure" project, without mentioning Boboli, because Griffin had not yet told Kroslak that Highland's client was Boboli. Moreover, after sending the December 23, 1987 price quotation, Comark received Highland's brochure artwork; the artwork text did not describe whether the pizza bread was fresh or frozen.

The reverse side of Comark's December 23, 1987 price quotation contained the following terms:

**ADDITIONAL TERMS:** Your acceptance of the terms of this Quotation also constitutes your acceptance of the following conditions:

1. If your account is not fully paid within sixty (60) days after the date of any invoice for work performed pursuant to this Quotation, you will be charged interest at the rate of one and one-half percent (1½%) per month until the account has been fully paid.

2. In the event that Cooperative Marketing[1] shall institute any collection proceedings against you with respect to your delinquent account, then you agree to pay to Cooperative Marketing on demand, an amount which is equal

---

**1.** Comark, a former division of the Cooperative Marketing Co., is the successor in interest to the Cooperative Marketing Co. for all purposes relevant to this appeal.

to all costs, charges and expenses paid or incurred by Cooperative Marketing in pursuing such collection, including, without limitation, all reasonable attorney's fees, court costs and other litigation expenses in connection therewith.

On January 4, 1988, Griffin sent Comark a purchase order requesting production of the brochures for a base price of $61,420 on more expensive seventy pound WOGR paper, and with additional color. After numerous negotiations, Kroslak and Griffin agreed that Comark would produce the brochures on the heavier seventy pound paper and with additional color for the same base price quoted for the fifty pound WOGR paper, notwithstanding the additional cost to Comark. In late January 1988, again at Kroslak's direction, Comark sent Griffin a third price quotation confirming the final brochure specifications and the base price of $61,420. This January 27, 1988 price quotation also contained the same additional terms and conditions as the December 23, 1987 price quotation above.[2]

In late January 1988, Comark shipped an initial group of 72,000 brochures to Boboli. Boboli in turn packaged 20,000 to 35,000 brochures with its pizza bread and shipped thousands of them to supermarkets for sale. Soon thereafter, a consumer informed Boboli that a red mark appeared on the pizza bread where a brochure had been placed. Subsequent inspection revealed that other pizza bread experienced the same problem. Boboli decided to cease packaging the brochures with the bread and informed Highland of the consumer's complaint. Highland in turn contacted Comark and, for the first time, informed Comark of Boboli's exact packaging process and of its plan to place the brochures in direct contact with freshly baked pizza bread. Kroslak told Griffin that, had he known this, Comark would not have produced the brochures without overwrapping each brochure in polypropylene plastic;

Griffin responded that Boboli's limited budget had prohibited overwrapping.

After determining that overwrapping was the only certain way to cure the problem, Kroslak offered to have Comark overwrap each brochure. Kroslak informed Griffin, however, that Comark would not bear the cost of the overwrapping, because Comark had fulfilled satisfactorily its responsibility to produce quality brochures. He reminded Griffin that she had refused to inform Kroslak of the nature of the Boboli pizza product and the manner in which the brochures would be packaged with that product. After this conversation, Griffin directed Kroslak to overwrap the brochures. The remaining brochures were overwrapped and sent to Boboli without further incident of bleeding. Comark had the nearly two million brochures overwrapped by an outside vendor at a cost of $16,651.

Subsequently, a dispute arose between Highland and Comark over the amount due under the brochure contract. Since March 1988, Highland has conceded that it owes Comark at least $55,220 for the brochures, but has refused to pay that amount because Comark asserts that Highland owes more. On June 6, 1988, Comark filed this diversity action against Highland for the amount due under the contract. The district court awarded Comark $86,960, plus prejudgment interest. The court did not, however, award attorney's fees as requested by Comark. Comark appealed, challenging the court's denial of attorney's fees. Highland cross-appealed, contesting the judgment against it.

B. *District Court Opinion*

The court held that Highland had agreed to pay Comark for producing approximately two million brochures and for the subsequent overwrapping cost. *See* Mem.Op. at 16–17 (opinion also available on Westlaw 1990 WL 17115). In the court's view, the Illinois Uniform Commercial Code (U.C.C.

---

**2.** The parties dispute whether the reverse side of Comark's November 23, 1987 price quotation contained these additional terms. Apparently, only the face of the quotation was offered and admitted at trial. The district court's findings of fact state that only the December 23, 1987 and January 27, 1988 price quotations contained the additional terms quoted in the text. We see no reason to disturb that finding.

or the Code) governed the case. Comark's January 27, 1988 price quotation was a "written confirmation of the terms of the parties' agreement," and both Comark and Highland were merchants under the Code. *Id.* at 17. The court then addressed the interest and attorney's fees clauses on the reverse side of the January 27, 1988 price quotation. It reasoned that these were "proposals for addition to the parties' contract" under paragraph 2–207(2) of the Code, and held that "the interest clause became part of the parties' contract because that clause did not materially alter the contract." *Id.* at 17. The attorney's fees clause, however, did alter materially the contract, as its inclusion "would result in surprise to Highland," and therefore the clause was not part of the contract. *Id.* at 18.

The court next addressed the issue of warranties. It held that any express warranty in connection with the Planters Popcorn coupons was met: the coupons provided a fair sample of FDA ink printing on OGR paper and were of the quality of the recipe brochures that Comark eventually produced. *See id.* at 18. Moreover, the court determined that Comark complied with the implied warranty of merchantability. The court relied on the language in paragraph 2–314(2)(a), (c) that goods are merchantable when they pass without objection in the trade under the contract description and are fit for the ordinary purpose for which the goods are used. *See id.* at 18–19. Finally, the court concluded that no implied warranty of fitness for a particular purpose arose under paragraph 2–315 because Comark was unaware of the particular purpose for which the brochure would be used and because Highland did not rely on Comark's skill or judgment to furnish appropriate brochures for Boboli's specific packaging process. *See id.* at 19.

## II

## ANALYSIS

### A. *Standard of Review*

This appeal presents challenges to the district court's attorney's fees and implied warranty of merchantability rulings. The court's conclusion that the attorney's fees clause materially altered the contract "is a question of fact to be resolved by the trial court, and thus we will overturn the court's conclusion only if clearly erroneous." *Luedtke Eng'g Co. v. Indiana Limestone Co.,* 740 F.2d 598, 600 (7th Cir.1984).[3] Likewise, the clearly erroneous standard governs our review of the court's finding that Comark did not breach the implied warranty of merchantability. *See ARB (American Research Bureau), Inc. v. E-Sys., Inc.,* 663 F.2d 189, 194–95 (D.C.Cir. 1980); *Wilson v. Marquette Elec., Inc.,* 630 F.2d 575, 581 (8th Cir.1980). A finding is clearly erroneous when, " 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). Nevertheless, "under the clearly-erroneous standard, we cannot meddle with a prior decision of this or a lower court simply because we have doubts about its wisdom or think we would have reached a different result." *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.,* 866 F.2d 228, 233 (7th Cir.1988), *cert. denied,* —— U.S. ——, 110 S.Ct. 141, 107 L.Ed.2d 100 (1989). On the contrary, if the court's account of the evidence "is plausible in light of the record reviewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently."

**3.** *See Dale R. Horning Co. v. Falconer Glass Indus., Inc.,* 730 F.Supp. 962, 966 (S.D.Ind.1990) (noting that whether a disclaimer was a surprise was a factual determination); *cf. Dale R. Horning Co. v. Falconer Glass Indus., Inc.,* 710 F.Supp. 693, 698 n. 6 (S.D.Ind.1989) (noting that materiality issue is a question of fact for court to decide when it is presented in the context of a Rule 12(b)(2) motion to dismiss); *Maxon Corp. v. Tyler Pipe Indus.,* 497 N.E.2d 570, 576–77 (Ind.App.Ct.1986) (noting that, in some states, certain clauses have been held to constitute a material alteration of the contract as a matter of law).

*Bessemer,* 470 U.S. at 574, 105 S.Ct. at 1511. Indeed, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.*

### B. *Attorney's Fees*

The parties do not dispute that Illinois law controls or that the U.C.C. governs this case.[4] Paragraph 2–207 of the U.C.C. states in relevant part:

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. *Between merchants such terms become part of the contract unless:*

(a) the offer expressly limits acceptance to the terms of the offer;

(b) *they materially alter it;* or

(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

Ill.Rev.Stat. ch. 26, para. 2–207(1)–(2) (emphasis supplied).

The narrow question presented is whether the district court clearly erred when it found that the attorney's fees clause on the reverse side of Comark's written confirmation (the January 27, 1988 price quotation) materially altered the contract and therefore did not become part of the contract between the parties. We pursue this inquiry by reviewing the record evidence in light of the standards of paragraph 2–207(2)(b).[5] Our research has disclosed no Illinois case that has addressed this precise issue. Nevertheless, as this court has noted previously, in assessing what is a material alteration, Illinois courts look to the commentary to paragraph 2–207 for guidance. *See Schulze & Burch Biscuit Co. v. Tree Top, Inc.,* 831 F.2d 709, 713–14 (7th Cir.1987). The commentary states that, typically, a clause is a material alteration when it results "in surprise or hardship if incorporated without express awareness by the other party." Ill.Rev.Stat. ch. 26, para. 2–207 comment 4; *see Trans–Aire Int'l, Inc. v. Northern Adhesive Co.,* 882 F.2d 1254, 1260 (7th Cir.1989). Thus, in Illinois, "the test for whether an additional term would be a material alteration in the contract is 'whether the addition constitutes an unreasonable surprise to one of the bargaining parties.'" *Schulze,* 831 F.2d at 713 (quoting *Clifford–Jacobs Forging Co. v. Capital Eng'g & Mfg. Co.,* 107 Ill.App.3d 29, 62 Ill.Dec. 785, 788, 437 N.E.2d 22, 25 (1982)).

The district court's ruling rested on the rationale that the inclusion of an attorney's fees clause was an unreasonable surprise to Highland, a point Comark strongly contests.[6] Initially, we note that Highland bore the burden of proving that the attorney's fees clause materially altered the contract. As between merchants, paragraph 2–207(2)(b) presumes the inclusion of the additional clause unless one of the three exceptions is met. Therefore, as the party opposing such inclusion, Highland bore the burden of proving the exception. *See Dale R. Horning Co. v. Falconer Glass Indus., Inc.,* 730 F.Supp. 962, 966 n. 2 (S.D.Ind.1990) ("burden of showing surprise appears to be on the nonassenting

---

**4.** *See Gross Valentino Printing Co. v. Clarke,* 120 Ill.App.3d 907, 76 Ill.Dec. 373, 376, 458 N.E.2d 1027, 1030 (1983) (contract for printed materials, such as magazines, constitutes contract for sale of goods).

**5.** Paragraph 2–207(2)(a) does not apply because Highland's January 4, 1988 purchase order contained no conditions or limitations. Likewise, paragraph 2–207(2)(c) is inapplicable; the dis-

trict court found that, prior to this litigation, neither Griffin nor any other Highland employee notified Comark that Highland had any objections to the interest or attorney's fees terms.

**6.** We need not address the alternative basis for finding a material alteration—hardship—because we affirm the district court's finding of material alteration based on the independent ground of unreasonable surprise.

buyer"); *see also Auburndale State Bank v. Dairy Farm Leasing Corp.*, 890 F.2d 888, 893 (7th Cir.1989) ("party who would lose if no evidence were presented has the burden"). We believe that Highland carried its burden and that the record supports the district court's conclusion that inclusion of the attorney's fees clause would materially alter the contract.

Comark contends that the district court improperly shifted the burden of proving the *absence* of material alteration by requiring it to introduce evidence of a preponderant industry custom and usage of attorney's fees clauses. We cannot accept this characterization of the record. In determining whether Highland was surprised by the inclusion of the attorney's fees term, the district court attempted to consider evidence of customary industry usage of such a term. Commenting on the issue at the close of trial, the district court stated, "there was no showing by the *parties* of the prevalence of the common nature of the attorney's fees clauses." Tr. of Dec. 13, 1989 at 16 (emphasis supplied). In our view, this remark does not evidence that the district court shifted the burden to Comark. It was quite natural for the court to express its puzzlement that a rather major consideration had not been addressed. We also note that, in an oral ruling on Comark's motion for reconsideration, the district court said:

> I am not inclined to address and I don't think I did address in my original ruling the issue of hardship with respect to the term calling for attorney's fees in this case. I just do not believe Comark has shown that providing for attorney's fees involved in the collection of the accounts is either an industry custom or an established course of dealing between the parties.

Tr. of Jan. 16, 1990 at 3. We are not convinced that this statement, when read in context, evidences a misconception on the part of the district court with respect to the ultimate burden of proof on this issue at trial. The remark was made immediately after the district court had noted that, in *Schulze*, 831 F.2d at 714, the party offering the additional terms had offered proof of prior dealings. Moreover, the district court already had concluded that Highland had offered evidence of surprise because it did not include such an attorney's fee clause in its own standard form contract. In this context, the court's remark on the absence of evidence of industry practice can be read as suggesting that, by way of rebuttal, Comark should have attempted to establish that Highland's practice was not in harmony with industry practice and therefore not an appropriate basis for surprise. We also note that Comark points to no attempt on the part of counsel to clarify the matter of burden of proof before the district court.

In denying Comark's motion for reconsideration, the court did not exclusively rely on the absence of industry usage. It also observed that there was no "established course of dealing between the parties" and that this dispute arose out of "essentially one transaction." Tr. of Jan. 16, 1990 at 3–4. Indeed, this transaction was the first between the parties, and Highland received only two price quotations that contained the additional attorney's fees term.[7] Thus, this transaction was not one involving parties familiar with the other's forms, terms, and practices. Lack of prior dealing is an important factor to consider in determining the existence of unreasonable surprise. *See Barliant v. Follett Corp.*, 138 Ill. App.3d 756, 91 Ill.Dec. 677, 681, 483 N.E.2d 1312, 1316 (1985); *Schulze*, 831 F.2d at 714–15; *Luedtke*, 740 F.2d at 600–01. On this record, the district court did not err in

---

7. The court also found no evidence that anyone at Highland ever read the reverse side of the December 23, 1987 or the January 27, 1988 price quotation. Comment 4 to paragraph 2–207 speaks of surprise occurring when a term is included without express *awareness of* the other party. We appreciate that awareness does not necessarily require a party actually to have read the additional term. *See Schulze*, 831 F.2d at

713. Nevertheless, the fact that a party did not read the term in question can be weighed significantly in the district court's determination as to whether the party expressly was aware of that term. This is particularly true when, as here, there is neither industry custom nor prior dealing between the parties that would forewarn a party that such a term potentially could be included.

its conclusion that the absence of industry custom and prior dealing ought to be given significant weight in determining whether Highland was unreasonably surprised by the inclusion of the attorney's fee clause.

Comark argues that Highland had to be aware of the attorney's fees clause because its own invoice to Boboli provided an additional term for interest. The inclusion of a term for interest charges in Highland's own invoice, however, does not lead automatically to the conclusion that Highland was aware of an attorney's fees clause contained in Comark's confirmation. The district court specifically found that Highland did not include any term for attorney's fees in its forms to customers. This finding supports the conclusion that Highland was surprised to find that in fact Comark included such a term. Attorney's fees and interest terms are treated differently under the Code. The commentary provides that a term for interest on overdue invoices is an example of a clause that would *not* involve an element of surprise. *See* Ill.Rev.Stat. ch. 26, para. 2–207 comment 5. On the other hand, a term for attorney's fees is not mentioned, and courts tend to analyze them on a case-by-case basis.[8]

The district court's finding that the inclusion of the attorney's fees clause would materially alter the contract was not clearly erroneous.

## C. *Implied Warranty of Merchantability*

In Illinois, "if the seller of goods is a merchant of goods of the kind being sold, a warranty that the goods are 'merchantable' is implied into a contract for their sale as a matter of law, unless otherwise expressly excluded or modified." *Bethlehem Steel Corp. v. Chicago E. Corp.*, 863 F.2d 508, 513 (7th Cir.1988); *see AFA Corp. v. Phoenix Closures, Inc.*, 501 F.Supp. 224, 229 (N.D.Ill.1980); *Soft Water Serv., Inc. v. M. Suson Enter., Inc.*, 39 Ill.App.3d 1035, 351 N.E.2d 264, 270 (1976); Ill.Rev.Stat. ch. 26, paras. 2–314(1), 2–316(2). Paragraph 2–314(2) states in pertinent part:

> Goods to be merchantable must be at least such as:
>
> (a) pass without objection in the trade under the contract description; and
>
> . . . .
>
> (c) are fit for the ordinary purposes for which such goods are used.

Ill.Rev.Stat. ch. 26, para. 2–314(2)(a), (c).

■ Comark is a merchant of the recipe brochures sold to Highland and did not disclaim the implied warranty of merchantability. Highland bore the burden of proving breach of the implied warranty of merchantability. In Illinois, the affirmative defense of breach of implied warranty "must be pleaded and proved by a preponderance of the evidence by the party relying on it." *Abatron, Inc. v. Fulton Contracting Co.*, 175 Ill.App.3d 692, 125 Ill.Dec. 158, 163, 530 N.E.2d 76, 81 (1988). According to Highland, the brochures did not pass without objection in the trade, because a Boboli customer complained of the bleeding red ink and because Boboli objected to the bro-

**8.** Comark cites appellate cases that have *affirmed* rulings that an attorney's fees clause did not materially alter a contract. *See Mid–S. Packers, Inc. v. Shoney's, Inc.*, 761 F.2d 1117, 1122 (5th Cir.1985); *Cement Asbestos Prods. Co. v. Hartford Accident & Indem. Co.*, 592 F.2d 1144, 1148 (10th Cir.1979); *Boyd v. Oscar Fisher Co.*, 210 Cal.App.3d 368, 258 Cal.Rptr. 473, 479 (1989); *Offen, Inc. v. Rocky Mountain Constructors*, 765 P.2d 600, 601 (Colo.Ct.App.1988); *Mace Indus., Inc. v. Paddock Pool Equip. Co.*, 288 S.C. 65, 339 S.E.2d 527, 531 (S.C.Ct.App.1986). On the other hand, Highland cites several cases that have reached the opposite result. *See Saint Charles Cable TV, Inc. v. Eagle Comtronics, Inc.*, 687 F.Supp. 820, 827–28 (S.D.N.Y.1988), *aff'd*, 895 F.2d 1410 (2d Cir.1989); *Surplus Elec. Corp. v. Gallin*, 653 P.2d 752, 754 (Colo.Ct.App.1982); *Johnson Tire Serv., Inc. v. Thorn, Inc.*, 613 P.2d 521, 523 (Utah 1980). We have reviewed these cases and conclude that each turns on its own unique factual scenario. For example, in *Shoney's* and *Offen*, there was a long course of prior dealing between the parties and the disputed term had been part of invoices exchanged by the parties on prior occasions. *See Shoney's*, 761 F.2d at 1123; *Offen*, 765 P.2d at 601. Therefore, we believe that these cases, read together, establish that "'material alteration' is a question of fact to be resolved by the circumstances of each particular case." *N & D Fashions, Inc. v. DHJ Indus., Inc.*, 548 F.2d 722, 726 (8th Cir.1976); *see* Anderson, 2 Uniform Commercial Code, § 2–207:31 at 289 (1982); Annotation, *What Are Additional Terms Materially Altering Contract Meaning of UCC § 2–207(2)(b)*, 72 A.L.R.3d 479, 500–05 (1976).

chures based on that defect. Moreover, the brochures were not merchantable because they were not fit for the ordinary purposes for which such goods are used. Highland reasons that ordinary use contemplates reasonably foreseeable use and that inserting the brochures in the packaging with the Boboli pizza bread was a reasonably foreseeable use. We cannot accept Highland's contentions. Highland's position that the brochures failed to pass without objection in the trade falters for two reasons. First, a customer's complaint about the bleeding brochure and Boboli's objection based on the bleeding do not mean that the goods necessarily failed to pass without "objection in the *trade.*" The term "trade" encompasses a more generally defined group than any one consumer or client. More fundamentally, the goods must fail to pass without objection in the trade *under the contract description.* The brochures were packed with freshly baked, hot, greasy pizza bread. The pizza dough is 180 degrees immediately after baking and between 80–95 degrees during packaging. The contract between the parties described none of these conditions. Indeed, the district court noted that the price quotations exchanged between the parties simply listed the job as a "recipe brochure" project, without mentioning further details. Therefore, Highland's argument that the brochures failed to pass without objection under the contract description cannot stand because the contract failed to describe that the brochures would be proximate to freshly baked, hot, greasy pizza bread.

■ For similar reasons, Highland's alternative argument that the brochures were unmerchantable because they were unfit for the ordinary purpose for which they were used is unconvincing. Highland presented no evidence to establish that, in order to pass without objection in the trade, brochures printed with FDA inks must be suitable for direct contact with freshly baked, hot, greasy pizza bread. Indeed, Kroslak told Griffin that, if Comark had known of the intended use, it would

have insisted on overwrapping the brochures. Moreover, Highland's suggestion that the brochure's ultimate use was reasonably foreseeable is disingenuous given Highland's unwillingness to reveal the nature of the brochure project. We held in *Bethlehem Steel* that "[m]erchantability ... does not look only at the particular use to which the buyer puts the goods." Rather, "[i]t is ... appropriate to analyze the transaction from the selling merchant's perspective." 863 F.2d at 514. Kroslak specifically asked Griffin for information concerning the conditions under which the brochures would be packaged with the product. Griffin refused to provide *any* such information, even when Kroslak informed her that Comark desired to know such information because of the nature of FDA inks and that overwrapping often should be considered. The district court indicated that, given Kroslak's prior experience, he assumed the pizza bread was frozen. Under all of these circumstances, the district court was justified in concluding that Comark had *no* reason to know of Boboli's intended use for the brochures until after the bleeding problem surfaced.[9] We therefore conclude that the district court did not err in finding that Comark did not breach the implied warranty of merchantability.

### Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED.

---

**9.** The district court also noted that Griffin's request for price quotations for brochures printed on OGR or WOGR paper would not necessarily have alerted Kroslak to the brochures' intended use—such paper and inks often are used with products proximate to, but not touching, food.